WORCESTER INSURANCE COMPANY *vs.* FELLS ACRES DAY
SCHOOL, INC., & others[1]
(and ten consolidated cases).

Middlesex. March 8, 1990. - August 22, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Child Abuse. Rape. Assault and Battery. Intentional Conduct. Child Care
Facility. Insurance,* Liability Insurance, Homeowner's insurance, Cov-
erage, Construction of policy. *Agency,* Scope of authority or employ-
ment. *Negligence,* Child care facility, Intentional conduct, Causing loss
of consortium, Employer, Imputed. *Corporation,* Corporate entity. *Wil-
ful, Wanton or Reckless Conduct. Words,* "Occurrence."

In response to a reported question, this court concluded that, as matter of
law, an intent to injure was to be inferred from intentional acts of
forceful sexual abuse and rape committed upon children enrolled at a
day care facility by employees of the facility, with the consequence that
assault and battery claims arising from these acts were not covered by
the facility's liability insurance. [398-402]

The facts stipulated by the parties to several civil actions identified the
corporate operator of a child care facility as the insured under certain
policies of liability insurance. [402-403]

On the facts as stipulated in a report to this court, the corporate operator
of a child care facility was not vicariously liable, under existing com-
mon law, for acts of forceful sexual abuse and rape committed by its
employees upon children enrolled at the facility. [404-405]

This court declined to impose upon operators of child care facilities a com-
mon law duty of care equivalent to that of innkeepers or common carri-
ers. [405-407]

On a report to this court of several civil actions arising out of acts of force-
ful sexual abuse and rape of children enrolled at a day care facility,
committed by its employees, the record did not contain sufficient uncon-
tested evidence for a determination whether the wrongful intent of the
employees was to be imputed to the corporate operator of the facility.
[407-409]

[1]Violet R. Amirault, Gerald A. Amirault, Cheryl Amirault LeFave
(who, along with Fells Acres and Albert LeFave, are defendants in the
underlying tort actions), and the plaintiffs in the underlying tort actions.

Negligence claims against three employees of a child care facility, arising from acts of forceful sexual abuse and rape of children enrolled at the facility, were covered by the employer's policy of liability insurance, to the extent that these claims alleged that the employees knew or should have known about the harmful acts yet failed to exercise care to prevent them. [409-411]

Claims against two employees of a child care facility, alleging injuries to children as the result of the employees' negligent failure to perform responsibilities incident to their employment, fell within the "business pursuits" exclusion of their respective policies of homeowner's insurance. [411-412]

Parental claims for loss of the companionship and society (consortium) of children, injured by the conduct of two employees of a child care facility, were covered by the employees' respective policies of homeowner's insurance independently of all claims for the underlying bodily injuries to the children, to the extent that the consortium claims were not themselves subject to a policy exclusion. [412-414]

Parental claims for loss of the companionship and society (consortium) of children injured by employees of a child care facility were covered by liability insurance policies issued to the operator of the facility, to the extent that the bodily injuries suffered by the children were the result of negligence or breach of warranty. [414-415]

Allegations in claims against the corporate operator of a child care facility and several individual defendants employed by or associated with the facility, describing various discrete acts of child abuse, negligence, and breach of duty by the defendants, would, if proved, constitute multiple "occurrences" for purposes of the corporation's liability insurance coverage. [415-417]

CIVIL ACTIONS commenced in the Superior Court Department on October 19, 1984; February 1, 1985; May 2, 1985; May 6, 1985; May 13, 1985; November 27, 1985; February 21, 1986; August 1, 1986; August 31, 1987; September 17, 1987; and September 25, 1987.

Questions of law were reported by *Hiller B. Zobel*, J., on a stipulation and statement of agreed facts.

The Supreme Judicial Court granted a request for direct review.

*Cynthia J. Cohen* for Worcester Insurance Company.

*Regina E. Roman* for Merrimack Mutual Fire Insurance Company.

*Saul A. Schapiro* (*Michael Hays* with him) for Jane Doe & others.

*Daniel C. Crane* for Paul A. Bennett & another.

*Juliane Balliro*, for Fells Acres Day School, Inc., *Ronald A. Pressman*, for Lareina Hurley, *Leonard Glazer & William Kahn*, for William B. Cronin & another, *& Frank J. Ciano*, for Barbara Miller & others, were present but did not argue.

ABRAMS, J. Pursuant to Mass. R. Civ. P. 64, 365 Mass. 831 (1974), a judge of the Superior Court has reported to us, without decision, eight questions (see Appendix) concerning whether certain insurance policies provide coverage for damage claims arising from sexual abuse allegedly perpetrated at the Fells Acres Day School (school). Two of the eleven consolidated cases before us are declaratory judgment actions brought by insurance companies[2] seeking a judgment that the injuries sustained by the tort plaintiffs in the nine underlying tort actions are not covered by various policies of insurance. The other nine cases are the underlying tort actions, brought by parents individually and as next friends of their children, against one or more of the tort defendants, seeking damages incurred as a result of sexual abuse that the children are alleged to have suffered while they were attending the school. We allowed the insurance companies' joint application for direct appellate review.

The parties' stipulation of agreed facts is substantially as follows. Fells Acres Day School, Inc. (Fells Acres), is a duly organized, for-profit Massachusetts corporation that operated the school, a group day care facility. The school enrolled as many as 48 children, ranging in age from fifteen months to five years. At all relevant times, the directors, officers, and shareholders of Fells Acres were Violet Amirault (Violet),

---

[2]The other declaratory judgment action was brought by Merrimack Mutual Fire Insurance Company against Fells Acres Day School, Violet R. Amirault, Gerald A. Amirault, Cheryl Amirault LeFave, Albert LeFave, and the plaintiffs in the underlying tort actions. We shall refer to the plaintiffs in the underlying tort actions as the "tort plaintiffs," and to the defendants in the underlying tort actions as the "tort defendants."

Gerald Amirault (Gerald), and Cheryl Amirault LeFave (Cheryl). Fells Acres employed up to seven staff members in addition to Violet, Gerald, and Cheryl. It maintained books and accounts as a corporation, paid Federal and State taxes and F.I.C.A. contributions as a corporation, maintained a corporate checking account from which expenses were paid, and filed annual reports of condition with the Office of the State Secretary.

Violet was the holder of a license to operate the school, issued by the Office for Children of the Commonwealth of Massachusetts. Operation of the school was subject to regulations promulgated by the Office for Children, 102 Code Mass. Regs. § 7.00 (1987). At all relevant times, Violet was a salaried employee of Fells Acres, holding the title of "director" of the school. As such, pursuant to Office for Children regulations, Violet was responsible for staff supervision and training. Gerald, Violet's son, was a salaried employee of Fells Acres, employed as the school's "program coordinator." For at least one year before the revocation of Violet's license to operate the school and the school's closing in 1984, Gerald also held the title "assistant director." Gerald was responsible for setting up and monitoring programs at the school and for assisting Violet in the administration of the school's programs. Cheryl, Violet's daughter, also was a salaried employee of Fells Acres, employed as an "assistant director" and a teacher. Cheryl was responsible for assisting Violet in the administration of the school's programs. Cheryl's husband, Albert LeFave (Albert), was not employed by Fells Acres.

In 1980, the Worcester Insurance Company (Worcester) issued to Fells Acres[3] a "Special Multi-Peril" (SMP) policy

[3]Although the policies identified, variously, "Violet R. Amirault d/b/a Fells Acres Day School," "Violet R. Amirault; Violet R. Amirault, Trustee," and "Violet Amirault Revocable Trust; Violet Amirault, Trustee," as the named insured, Worcester, Fells Acres, and Violet intended that the policies would provide insurance for Fells Acres Day School, Inc. Accordingly, these parties have agreed that coverage will be provided to Fells Acres to the same extent as if it had been identified as the named insured. See section 2, infra.

of insurance, containing both property and liability coverages, for the period from October, 1980, to October, 1983. In 1983, Worcester issued another SMP policy for the period from October, 1983, to October, 1986. Worcester also issued to Violet a homeowner's insurance policy for her residence in Malden, for the period from June, 1979, to June, 1982. In September, 1983, Merrimack Mutual Fire Insurance Company (Merrimack) issued to Cheryl and Albert a homeowner's policy for their residence in Melrose, for the period from September, 1983, to September, 1984.

The nine underlying tort actions seek damages from one or more of the following tort defendants: Fells Acres, Violet, Gerald, Cheryl, and Albert. The claims of the plaintiffs in the underlying tort actions are set forth in a Uniform Complaint and individual complaints that adopt parts of the Uniform Complaint. The Uniform Complaint alleges claims of assault and battery by the individual tort defendants; vicarious liability of Fells Acres; negligence of Violet, Gerald, Cheryl, and Fells Acres; and breach of warranty by Fells Acres. The facts underlying the tort complaints are the acts of sexual abuse that are alleged to have occurred while the child tort plaintiffs were attending and in the care of the school.

Some of these alleged acts of abuse formed the basis for criminal prosecutions against some of the tort defendants. Gerald was tried and convicted of rape and indecent assault and battery on six of the child tort plaintiffs. He also was convicted of indecent assault and battery on another of the child tort plaintiffs.[4] We affirmed those convictions. See *Commonwealth* v. *Amirault*, 404 Mass. 221 (1989). Violet was convicted of rape and indecent assault and battery on two of the child tort plaintiffs and convicted of indecent assault and battery on another child tort plaintiff. Cheryl was convicted of rape and indecent assault and battery on three of the child tort plaintiffs and convicted of indecent assault

---

[4]Gerald also was convicted on two additional indictments charging rape involving children who are not among the tort plaintiffs.

and battery on another of the child tort plaintiffs. We affirmed those convictions. *Commonwealth* v. *LeFave*, 407 Mass. 927 (1990). Some of the child tort plaintiffs allege acts of abuse for which the tort defendants were not tried. The tort defendants deny that they abused the children and deny that the children were sexually abused by anyone while the children were in attendance at or in the care of the school.

1. *Assault and battery.* The Uniform Complaint alleges that each of the four tort defendants "did assault the minor plaintiffs with great force, raped and sexually molested the minor plaintiffs." The insurance companies contend that, under the terms of any of the policies, there can be no coverage[5] for assault and battery of the child tort plaintiffs because the injuries were "expected or intended from the standpoint of the insured."[6] The tort plaintiffs contend that there is insufficient information in the record to permit any conclusion concerning the intent of the tort defendants and that the issue is a factual one to be determined at trial.

The parties' stipulation of facts includes an assertion that, at the trial of the declaratory judgment actions, the tort plaintiffs would seek to offer the opinion of a psychiatrist, Dr. Bernard Yudowitz, on the intent issue.[7] Dr. Yudowitz would testify that it is impossible to draw conclusions about the in-

---

[5] The question of the insurance companies' duty to defend is not before us.

[6] Worcester's SMP policies provide coverage for an "occurrence," defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage *neither expected nor intended from the standpoint of the insured.*" The Worcester homeowners' policy contains an exclusion for "bodily injury or property damage which is *either expected or intended from the standpoint of the insured.*" The Merrimack homeowner's policy also contains an exclusion for "bodily injury or property damage . . . which is *expected or intended by the insured.*" (Emphases supplied.)

[7] The tort plaintiffs would seek to qualify Dr. Yudowitz as an expert. The stipulation of facts notes that the insurance comanies reserve their right to object to the admission of Dr. Yudowitz's testimony and to offer their own expert or experts. Because the question is not before us, we express no opinion concerning the admissibility of Dr. Yudowitz's testimony.

tent of a child abuser without extensive evaluation and testing and that child abusers act from a variety of motives. Dr. Yudowitz's research yields examples of the variety of sex abuse offenders, including "highly sociopathic individual[s]," "mentally deranged individual[s]," "sadistic individual[s]," individuals "who [have] never socially matured and can only have sexual intimacy with children," and several other types. Moreover, it is stipulated, Dr. Yudowitz's review of the Uniform Complaint convinces him that "it is impossible to state . . . that the perpetrators in this case intended harm or injury." Dr. Yudowitz has not examined the tort defendants. The stipulation also states that "the tort defendants do not consent to be psychiatrically tested, evaluated, or diagnosed, nor do they consent to the release of any medical or other confidential records in connection with this case."

All of the insurance policies provide coverage for "occurrences," defined to include "accidents." Generally, an injury "which ensues from the volitional act of an insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur." *Quincy Mut. Fire Ins. Co.* v. *Abernathy*, 393 Mass. 81, 84 (1984). In *Quincy Mut. Fire*, we applied this standard to a situation in which an insured intentionally threw a large piece of "blacktop" at an automobile, injuring its occupants. In concluding that the insurer was not entitled to summary judgment on the question whether the injuries to the automobile's occupants were accidental, we concluded that the injuries would be covered unless "the insured knew to a substantial certainty that the bodily injury would result." *Id.* at 86. The tort plaintiffs contend that, although the alleged acts of sexual abuse are intentional in nature, there is no basis to conclude that the tort defendants "knew to a substantial certainty" that injuries would result. We disagree.

Forceful sexual molestation and rape are unlike the defendant's actions in *Quincy Mut. Fire*. There, it was possible that the injuries resulting from the insured's intentional act were accidental. This case more closely resembles *Newton* v.

*Krasnigor*, 404 Mass. 682 (1989), in which we determined
that the actions of an insured who intentionally started a fire
in a building necessitated the inference that, "as matter of
law, [the insured] intended to cause some property damage
. . . ." *Id.* at 687. In this case, as in *Krasnigor*, the nature of
the acts alleged is such that we must conclude, as a matter of
law, that the insureds intended to cause at least some injury
to the tort plaintiffs. "Child molestation and the injury
caused by it are so closely tied as to be virtually inseparable.
Except in the strongest of factual situations, intent to commit
this act carries with it the intent to inflict the injury." *Roe* v.
*State Farm Fire & Casualty Co.*, 259 Ga. 42, 42 (1989).
Accord *Harpy* v. *Nationwide Mut. Fire Ins. Co.*, 76 Md.
App. 474, 484 (1988); *K.A.G.* v. *Stanford*, 148 Wis. 2d 158,
164-165 (Ct. App. 1988). Sexual assault and rape are, in this
respect, indistinguishable from any other deliberate assault
and battery. "[T]he act of striking another in the face is one
which we recognize as an act so certain to cause a particular
kind of harm that we can say a person who performed the
act intended the resulting harm, and his statement to the
contrary does nothing to refute that rule of law." *CNA Ins.
Co.* v. *McGinnis*, 282 Ark. 90, 93 (1984), quoting *Clark* v.
*Allstate Ins. Co.*, 22 Ariz. App. 601, 602 (1975). See *Bowen*
v. *Lloyds Underwriters*, 339 Mass. 627, 629 (1959); *Terrio*
v. *McDonough*, 16 Mass. App. Ct. 163, 169 (1983); *Lipson*
v. *Queen Ins. Co.*, 2 Mass. App. Ct. 901 (1974). Rape and
sexual assault, too, because of their direct and forcible na-
ture, are acts of the same inherently injurious kind.
"[R]eason mandates that from the very nature of the act,
harm to the injured party must have been intended." *United
States Fidelity & Guar. Co.* v. *American Employer's Ins.
Co.*, 159 Cal. App. 3d 277, 291 n.9 (1984), quoted in *Kras-
nigor*, *supra* at 686 n.7.

The proffered testimony of Dr. Yudowitz does not alter
our conclusion, particularly because the tort defendants deny
the abuse and refuse to submit to any medical examination.
The mere fact that, as a group, child abusers have a variety
of *motives* does not render their harmful actions *uninten-*

*tional.* Nowhere in the record is there a jot of evidence suggesting that the tort defendants were suffering from a mental disease or defect that would render them incapable of forming an intent to harm the child plaintiffs.[8] Thus, *Baker* v. *Commercial Union Ins. Co.*, 382 Mass. 347 (1981), cited by the tort plaintiffs, is inapposite. *Baker* stands only for the "well-established rule that '[i]f the insured was insane at the time that he wilfully or intentionally caused the [damage or injury], the insurer remains liable on the policy' . . . ." *Id.* at 350. Cf. *Clemmer* v. *Hartford Ins. Co.*, 22 Cal. 3d 865 (1978). Nothing in the stipulation of facts, including the proffered testimony of Dr. Yudowitz, who has not examined the tort defendants, suggests any possibility that the tort plaintiffs will be able to demonstrate that the tort defendants were not criminally responsible at the time of the alleged sexual abuse.[9]

In concluding that an intent to injure may be inferred as a matter of law from acts of child molestation and rape, we join the overwhelming majority of the jurisdictions that have considered the issue.[10] See *Foremost Ins. Co.* v. *Weetman*, 726 F. Supp. 618 (W.D. Pa. 1989) (Pennsylvania law); *Allstate Ins. Co.* v. *Roelfs*, 698 F. Supp. 815 (D. Alaska 1987) (Alaska law); *Allstate Ins. Co.* v. *Thomas*, 684 F. Supp. 1056 (W.D. Okla. 1988) (Oklahoma law); *Twin City Fire*

---

[8]The complete absence from the record of any evidence of mental disease or defect renders irrelevant the tort plaintiffs' argument concerning the burden of proof, in light of the parties' agreement that "all of the material facts to determine the issues" are contained in the stipulation of facts.

[9]*Massachusetts Property Ins. Underwriting Ass'n* v. *Norrington*, 395 Mass. 751 (1985), cited by the tort plaintiffs, is inapposite. That case concerns the question whether the criminal conviction of the insured precludes the relitigation of issues determined in the criminal trial. Although, under *Norrington*, the tort plaintiffs are not *precluded* from relitigating the tort defendants' ability to form an intent to injure, nothing in the record before us permits the inference that the tort defendants were unable to form such an intent. Moreover, the parties have agreed that "all of the material facts to determine the issues . . . are contained in the Stipulation."

[10]Our conclusion on this point makes it unnecessary for us to answer the second reported question. See Appendix.

*Ins. Co.* v. *Doe*, 788 P.2d 121 (Ariz. Ct. App. 1989); *CNA Ins. Co.* v. *McGinnis, supra*; *Allstate Ins. Co.* v. *Troelstrup*, 789 P.2d 415 (Colo. 1990) (en banc); *Landis* v. *Allstate Ins. Co.*, 546 So. 2d 1051 (Fla. 1989); *Roe* v. *State Farm Fire & Casualty Co., supra*; *Altena* v. *United Fire & Casualty Co.*, 422 N.W.2d 485 (Iowa 1988) (sexual abuse of adult by victim's landlord); *Harpy* v. *Nationwide Mut. Fire Ins. Co., supra*; *Auto-Owners Ins. Co.* v. *Gardipey*, 173 Mich. App. 711 (1988); *Estate of Lehmann* v. *Metzger*, 355 N.W.2d 425 (Minn. 1984); *Vermont Mut. Ins. Co.* v. *Malcolm*, 128 N.H. 521 (1986) (overruling sub silentio *MacKinnon* v. *Hanover Ins. Co.*, 124 N.H. 456 [1984]); *Rodriguez* v. *Williams*, 107 Wash. 2d 381 (1986) (en banc); *Horace Mann Ins. Co.* v. *Leeber*, 376 S.E.2d 581 (W. Va. 1988); *N.N.* v. *Moraine Mut. Ins. Co.*, 153 Wis. 2d 84 (1990).[11] Only three cases lend any support to the proposition that inquiry into the sexual abuser's motivations is necessary. See *State Auto Mut. Ins. Co.* v. *McIntyre*, 652 F. Supp. 1177, 1219 (N.D. Ala. 1987) ("whether a bodily injury is expected or intended by an insured is a question of fact for the jury or judge and a purely subjective standard governs such factual determination"). Cf. *Allstate Ins. Co.* v. *Jack S*, 709 F. Supp. 963 (D. Nev. 1989) (court would not infer intent to injure when perpetrator of sexual abuse was only fourteen years old); *Public Serv. Mut. Ins. Co.* v. *Goldfarb*, 53 N.Y.2d 392 (1981) (holding that insurance company had duty to defend dentist, who allegedly sexually molested his patients, under policy covering liability for injury resulting from "undue familiarity"). We are unconvinced by these authorities and consider it the better rule that intent to injure may be inferred from the intentional commission of an inherently injurious act

---

[11]In California, the Courts of Appeal have disagreed on the issue, and the California Supreme Court is now considering it. Compare *Fire Ins. Exch.* v. *Abbott*, 204 Cal. App. 3d 1012 (1988) (following majority rule), with *J.C. Penney Casualty Ins. Co.* v. *M.K.*, 209 Cal. App. 3d 1208 (1989) (rejecting majority rule), review granted, 261 Cal. Rptr. 310 (1989).

such as forcible sexual abuse. These policies provide no coverage for such acts.

2. *Claims against Fells Acres.* Apparently because of the confusion concerning the identity of the insured under the SMP policies, see note 3, *supra,* the Uniform Complaint makes identical allegations of vicarious liability, negligence, and breach of warranty against both "Fells Acres Day School, Inc." and "Fells Acres Day School, Inc. and/or Violet Amirault d/b/a Fells Acres Day School." The parties' stipulation states that "[i]t was intended by Worcester, Fells Acres and Violet that the policies . . . would provide liability insurance for Fells Acres . . . . Worcester, Fells Acres and Violet have therefore agreed that coverage will be provided to 'Fells Acres Day School, Inc.' to the same extent as if it had been identified as the named insured." On the basis of this agreement, Worcester argues that the claims against "Fells Acres Day School, Inc. and/or Violet Amirault d/b/a Fells Acres Day School" are neither actionable nor covered under Worcester's SMP policies. We agree.

According to the parties' stipulation of facts, Fells Acres (the corporation) operated the school at all times relevant to the cases before us. The school had ceased operation as a sole proprietorship by Violet in 1975. Thus, there is no factual foundation for claims against "Violet Amirault d/b/a Fells Acres Day School." Under the terms of the SMP policies, there also is no coverage for any sole proprietorship. The policies provide that "if the named insured is designated in the Declarations as an individual, the person so designated [is an insured] *but only with respect to the conduct of a business of which he is the sole proprietor*" (emphasis supplied). Because the school was operated by Fells Acres beginning in 1975, there can be no coverage under the policy terms for the sole proprietorship of "Violet d/b/a Fells Acres Day School." Certainly the facts as stipulated indicate no factual basis from which to conclude that there is coverage for (or any basis for tort claims against) the purported joint venture of Violet and Fells Acres. The parties have agreed that Fells

Acres is the insured, and there is no reason to disturb their agreement.

3. *Vicarious liability.* The Uniform Complaint alleges that the assaults and batteries "were performed by one or more agents, servants, and/or employees of the defendant school while they were acting within the course and scope of their employment." On this issue, the parties have directed their arguments not at the question of insurance coverage, but at the question whether there can be any vicarious liability claim or claims under the stipulated facts. In their arguments, the parties divide the question into two parts: (a) whether, under traditional concepts of vicarious liability, the assaults and batteries were outside the scope of employment; and (b) whether the facts alleged are sufficient to support an extension of vicarious liability under the theory that Fells Acres assumed a nondelegable duty akin to that imposed on common carriers to protect the children in its care.[12]

a. *"Traditional" vicarious liability.* An employer may be held vicariously liable for the intentional tort of an agent if the tortious act or acts were committed within the scope of employment. *Miller* v. *Federated Dep't Stores, Inc.*, 364 Mass. 340 (1973). "[C]onduct of an agent is within the scope of employment if it is of the kind he is employed to perform . . . ; if it occurs substantially within the authorized time and space limits . . . ; and if it is motivated, at least in part, by a purpose to serve the employer . . . " (citations omitted). *Wang Laboratories, Inc.* v. *Business Incentives, Inc.*, 398 Mass. 854, 859 (1986). See *Commonwealth* v. *L.A.L. Corp.*, 400 Mass. 737, 742 (1987). The essential element that must be shown "is that the employee's assault was in response to the plaintiff's conduct which was presently interfering with the employee's ability to perform his duties successfully. This interference may be in the form of an affirmative attempt to prevent an employee from carrying out

[12]We note that, although the parties address this second issue, the claim is not explicitly advanced in the Uniform Complaint. The parties are, of course, free to amend the pleadings. See Mass. R. Civ. P. 15 (b), 365 Mass. 761 (1974).

his assignments . . . in the failure to do acts necessary to enable the employee to begin or continue his assignments . . . . Assaults arising in either of these contexts constitute acts committed within the scope of employment, in that they stem from and directly relate to the frustration of the ability to perform on the assignments for which the employee is presently responsible." (Citations omitted.) *Miller, supra* at 350. Under this standard, the conduct alleged here does not trigger vicarious liability.

The only factor even arguably supporting the tort plaintiffs' claims under this theory is that some of the abuse is alleged to have occurred "within the authorized time and space limits." *Wang Laboratories, Inc., supra* at 859, i.e., at the school during school hours. Because some of the abuse is alleged to have been committed off the school grounds, even this factor does not support the plaintiffs. Moreover, these acts obviously were not "of the kind [the employees were] employed to perform," nor were they "motivated, at least in part, by a purpose to serve the employer." *Id.* Certainly the individual tortfeasors' assaults could not have been in response to any conduct by the child tort plaintiffs that was in any way "interfering with [the tort defendants'] ability to perform" their duties. *Miller, supra* at 350. On the basis of the stipulated facts, then, Fells Acres is not vicariously liable for the assaults and batteries.[13]

b. *Extension of "common carrier" liability.* Common carriers, innkeepers, and the like are held liable for the negligence or the wilful wrongs of their employees, under the rule that "[a] carrier is under an obligation 'to use a very high

---

[13]The tort plaintiffs urge us to broaden our standards so as to permit the imposition of vicarious liability when the tortious conduct "originated in activities so closely associated with the employment relationship as to fall within its scope." *Stropes* v. *Heritage House Childrens Center of Shelbyville, Inc.*, 547 N.E.2d 244, 247 (Ind. 1989). We need not reach this issue, because we conclude that the acts alleged would not trigger vicarious liability even under the broader standard cited by the tort plaintiffs. None of the acts of forcible sexual molestation or rape can be interpreted as "originating in" any legitimate activities "closely associated with the employment relationship." *Id.*

degree of care to prevent injuries that might be caused by the . . . wilful misconduct of others. . . . In the application of the rule to injuries caused by servants of the carrier while engaged in the performance of his contract of carriage, it is held that he is liable absolutely for their misconduct.' " *Gilmore* v. *Acme Taxi Co.*, 349 Mass. 651, 653 (1965), quoting *Hayne* v. *Union St. Ry.*, 189 Mass. 551, 552 (1905). Accord *Carey* v. *New Yorker of Worcester, Inc.*, 355 Mass. 450, 452 (1969). Liability is imposed regardless of negligence. *Gilmore, supra* at 652. Accord *Bryant* v. *Rich*, 106 Mass. 180, 188 (1870). Indeed, a common carrier is liable not only for the misconduct of its employees, whether or not within the scope of employment, but also for the wrongs of strangers, if they are inflicted on a person in its care. *Quigley* v. *Wilson Line of Mass., Inc.*, 338 Mass. 125, 128 (1958). The tort plaintiffs in this case argue that we should hold Fells Acres to the standard of care to which common carriers are held. This we decline to do.

Although our law recognizes a variety of special relationships that impose affirmative duties of care, see generally *Irwin* v. *Ware*, 392 Mass. 745 (1984), the standard to which common carriers are held is the very highest, approaching that of an insurer. See *O'Malley* v. *Putnam Safe Deposit Vaults, Inc.*, 17 Mass. App. Ct. 332, 340 (1983). Although in some jurisdictions, hospitals have been held to this standard, see *Stropes* v. *Heritage House Childrens Center of Shelbyville, Inc.*, 547 N.E.2d 244, 253 (Ind. 1989),[14] we are aware of no cases imposing common carrier-type liability on

---

[14]The Indiana Supreme Court cited *Vannah* v. *Hart Private Hosp.*, 228 Mass. 132 (1917), in support of its extension of common carrier liability to hospitals. We regard that case as having been decided on a contract theory: "[W]here (as . . . in the case at bar) the injury done the plaintiff is caused by an act of the defendant's servants outside of the servants' duty as employees of the defendant but by an act of the defendant's servants which while not in the course of the servants' employment is none the less a violation of the duty owed by the defendant under the defendant's contract with the plaintiff, the only action that can be brought is an action founded upon the duty arising out of the contract." *Id.* at 138.

an enterprise such as a group day care center.[15] Moreover, the tort plaintiffs have not pleaded this theory in the Uniform Complaint, nor have they argued the issue fully and completely in their briefs. In these circumstances, and because the imposition of common carrier liability on group day care centers would constitute a significant extension of current Massachusetts law, we decline to adopt such a rule in this case.

4. *Negligence and breach of warranty claims against Fells Acres.* The Uniform Complaint contains counts of negligence and breach of warranty against Fells Acres. The tort plaintiffs argue that Fells Acres may be liable in negligence and breach of warranty under a variety of theories. See, e.g., *Doe v. Blandford*, 402 Mass. 831 (1988) (negligent hiring and retention of employee who assaulted plaintiff); *Mullins v. Pine Manor College*, 389 Mass. 47 (1983) (negligent failure to provide adequate security to protect students at residential college); *Brown v. Knight*, 362 Mass. 350 (1972) (negligent supervision of children by day camp operator); *Vannah v. Hart Private Hosp.*, 228 Mass. 132 (1917) (breach of contract for failure of hospital to protect patient). Worcester asserts that there is no coverage for these claims, because "the children's injuries were not accidental from the standpoint of Fells Acres" and the corporation "expected or intended" the injuries resulting from the assaults and batteries on the plaintiffs.

Worcester grounds this argument in part on the contention that we should disregard the corporate form and impute to the corporation the intentions of its corporate officers and stockholders, Violet, Gerald, and Cheryl. Generally, we have been reluctant to disregard the corporate fiction. We disregard the corporate fiction and impute to the corporation the

---

[15]The United States Court of Appeals for the Fourth Circuit, in a case decided under South Carolina law, refused to extend the theory to private security agencies, despite the court's observation that private security agencies are subject to a comprehensive regulatory scheme under South Carolina law. See *Rabon v. Guardsmark Inc.*, 571 F.2d 1277 (4th Cir.), cert. denied, 439 U.S. 866 (1978).

intentions of its principals only in "rare particular situations in order to prevent gross inequity." *Gurry* v. *Cumberland Farms, Inc.*, 406 Mass. 615, 626 (1990), quoting *My Bread Breaking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 620 (1968). See *Gordon Chem. Co., Inc.* v. *Aetna Casualty & Sur. Co.*, 358 Mass. 632, 638 (1971). See also *Osvaldo Varane, Inc.* v. *Liberty Mut. Ins. Co.*, 362 Mass. 864 (1972). The stipulation of facts includes little to persuade us that under traditional principles the corporate form should be disregarded, although further factual inquiry might yield facts that would convince us otherwise.

Our discussion whether we should disregard the corporate fiction does not exhaust the question, however. In some circumstances, there may be reason to impute to a corporation the wrongful intent of officers, directors, or stockholders even without disregarding the corporate form. We have considered this issue in the context of criminal prosecutions of corporations, where the critical question is how the Commonwealth may establish the requisite criminal intent on the part of a corporation. In *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972), we approved instructions to the effect that when "the conduct for which the corporation is being held accountable [is] performed *on behalf of the corporation*," "*the acts and the intent of the individuals [are] the acts and intent of the corporation*" (emphasis in original). *Id.* at 258, 273, 255. Accord *Commonwealth* v. *L.A.L. Corp.*, 400 Mass. 737, 742 and 744 (1987) (same principles apply to close corporations).

This theory of when the intentions of corporate principals may be attributed to the corporation has been applied in the insurance context as well. See *Cora Pub, Inc.* v. *Contentinal Casualty Co.*, 619 F.2d 482, 486 (5th Cir. 1980) (where arson is "committed for the benefit of the corporation by an officer . . . courts have often imputed the arson of the individual to the corporation"). Accord *Osvaldo Varane, Inc.*, *supra*. Thus, if the alleged acts of abuse were in any way

performed on behalf of the corporation, the abuse would be attributable to the corporation. For example, if it were shown that the individual defendants were engaged in the sale of child pornography and that the corporation was financially implicated in such activity, the intentions of the wrongdoers properly could be imputed to Fells Acres.

Similarly, if it could be shown that abuse at the school was so routine as to constitute a general practice or policy, the abuse could be imputed to Fells Acres, even if the abuse was not committed for the benefit of the corporation. Considerations of this kind led a court to conclude that, although a corporate insured was covered for negligent supervision claims when its principals had sexually harassed employees, the insurance company had no responsibility "for the corporation's intentional or discriminatory acts." *Seminole Point Hosp. Corp.* v. *Aetna Casualty & Sur. Co.*, 675 F. Supp. 44, 47 (D.N.H. 1987).

Other considerations as well might persuade us to impute the wrongful intent of Violet, Gerald, or Cheryl to Fells Acres. We cannot reach a precise determination on this issue in the absence of a more fully developed factual record. The inquiry is factually based, and may have to be conducted as to each injury. We do not have sufficient uncontroverted evidence in the record to determine whether Fells Acres expected or intended the injuries. The fact alone that the corporation's officers and shareholders committed intentional torts would not be sufficient to warrant imputing their expectations or intentions to Fells Acres. See *Lawler Mach. & Foundry Co.* v. *Pacific Indem. Ins. Co.*, 383 So. 2d 156 (Ala. 1980); *Rivers* v. *Brown*, 168 So. 2d 400 (La. Ct. App. 1964).

5. *Negligence claims against Violet, Gerald, and Cheryl.* The plaintiffs have alleged that Violet, Gerald, and Cheryl were negligent in the performance of their duties at the school. The insurance companies argue that there can be no coverage for these claims, because (a) the individual tort defendants "expected or intended" injury to the tort plaintiffs (see section 1), and any claims in negligence must fail for that reason; and (b) as far as claims against Violet and

Cheryl are concerned, their respective homeowner's policies exclude coverage for business-related liability.

a. *Expected or intended injury.* Under the terms of the SMP policies issued by Worcester, Violet, Gerald, and Cheryl are all insureds under a clause providing that, "if the named insured is designated . . . as other than an individual, partnership or joint venture, [persons insured include] the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such." Worcester argues, however, that there is no insurance coverage under the SMP policy for the negligence claims against Violet, Gerald, and Cheryl, because "each of these individuals knew and expected that the others routinely committed abusive acts of the sort that they often perpetrated together — indeed, that it was their common goal to facilitate such abuse."

We agree with Worcester's argument that, "to the extent that the plaintiffs seek to recover in negligence from the same individuals whom they have sued for assault and battery, *for the same acts which are contended to be the basis of those assault and battery claims*, the negligence claims are legally unsupportable" (emphasis supplied). See *Sabatinelli* v. *Butler*, 363 Mass. 565, 567 (1973) ("[i]f conduct is negligent it cannot also be intentional"). Accord *Allstate Ins. Co.* v. *Troelstrup*, 789 P.2d 415, 418 n.7 (Colo. 1990) (en banc) (denying coverage for "negligent" sexual abuse claim); *Linebaugh* v. *Berdish*, 144 Mich. App. 750 (1985) (same). The tort plaintiffs, however, apparently proceed on a conventional negligence theory; the Uniform Complaint alleges that Violet, Gerald, and Cheryl each "knew or should have known of the assault, rape and sexual molestation of the minor plaintiffs and failed to exercise care to prevent" these acts. We do not agree with Worcester's argument that a tort defendant's knowledge (if any) of the abusive acts committed by others nullifies coverage for a negligence claim.[16]

---

[16]Of course, a tort defendant's participation in or active facilitation of abuse by others would constitute "intended" injury and would not be cov-

The knowledge of one of the tort defendants concerning the abusive activities of the others, coupled with the failure to protect the children, renders that tort defendant's conduct reckless. Restatement (Second) of Torts § 500 (1965), states: "The actor's conduct is in reckless disregard of the safety of another if he . . . intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know . . . not only that his [omission] creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." See, e.g., *Pridgen* v. *Boston Hous. Auth.*, 364 Mass. 696, 705 (1974); *Baines* v. *Collins*, 310 Mass. 523, 526 (1942).

Generally, injuries resulting from reckless conduct do not fall into the category of "expected or intended" injuries, but are considered "accidental" and thus are covered under insurance policies. "Our cases have concluded that an injury is nonaccidental only where the result was actually, not constructively, intended, i.e., *more than recklessness*" (emphasis supplied). *Quincy Mut. Fire Ins. Co.* v. *Abernathy*, 393 Mass. 81, 86 (1984) (reversing summary judgment for insurer on coverage issue when insured intentionally threw a large piece of "blacktop" at a car, injuring occupants). Accord *Sheehan* v. *Goriansky*, 321 Mass. 200, 205 (1947). See *Peterson* v. *Western Casualty & Sur. Co.*, 5 Wis. 2d 535 (1958) (affirming liability of insurance company for injuries sustained when insured's automobile struck plaintiff while insured was attempting to use the automobile to evade arrest). The omissions alleged in the negligence counts amount to reckless, not wilful conduct. Thus, the SMP policies cover the claims of negligence by Violet, Gerald, and Cheryl, to the extent that the claims do not seek recovery for the same acts that are the basis of the assault and battery claims.

---

ered. See section 1, *supra*. Participation and facilitation appear to be what one plaintiff family means by the term "common scheme." We decline Worcester's invitation to find that the abuse was the "common goal" of the individual tort defendants. It is not for an appellate court to find facts.

b. *Business-related exclusions in the homeowner's policies.* The insurance companies argue that the negligence[17] claims against Violet and Cheryl fall within the "business pursuits" exclusions of their respective homeowner's policies.[18] We agree. The negligence claims plainly allege negligent failure to perform responsibilities incident to the insureds' business pursuits as directors of the school. The insureds' responsibilities "to prevent the assault, rape and sexual molestation of the minor plaintiffs" derive from the school's contractual agreement to provide care for the child tort plaintiffs. The negligence claims would have no factual basis were Violet and Cheryl not in positions of responsibility in the school, the operation of which was a business pursuit the insureds owned and engaged in for profit. See *Newell-Blais Post #443, Veterans of Foreign Wars of the U.S., Inc.* v. *Shelby Mut. Ins. Co.*, 396 Mass. 633, 636 (1986); *Ratner* v. *Canadian Universal Ins. Co.*, 359 Mass. 375, 379 (1971). "[T]he manifest design of homeowners' insurance is to protect homeowners from risks associated with the home and activities related to the home." *Worcester Mut. Ins. Co.* v. *Marnell*, 398 Mass. 240, 245 (1986). The alleged negligence of Violet and Cheryl is in no way "associated with" or "related to" the home. These claims are not covered by the homeowner's policies.[19]

6. *Consortium claims.* The Uniform Complaint prays for consortium damages but does not include a separate claim by the adult tort plaintiffs for loss of consortium. Thus, the issue whether any consortium claims are covered by the insurance policies is only arguably within the purview of the first re-

---

[17]The insurance companies also argue that this exclusion precludes coverage for claims of intentional wrong by Violet and Cheryl. We need not consider this argument because of our conclusion in section 1, *supra*, that the claims of intentional wrong are not covered.

[18]Cheryl's homeowner's policy, issued by Merrimack, provides that coverage is excluded for "bodily injury . . . arising out of business pursuits of any insured." Violet's homeowner's policy, issued by Worcester, contains an identical exclusion.

[19]Our conclusion on this point renders it unnecessary for us to interpret the "professional services" exclusion in Violet's homeowner's policy.

ported question. See Appendix. Nevertheless, because the parties have argued the issue, and because the plaintiffs are free to amend their complaints (see Mass. R. Civ. P. 15 [b]), we discuss it.

a. *The homeowner's policies.* Worcester's homeowner's policy defines "bodily injury" as "bodily injury, sickness or disease, including care, loss of services and death resulting therefrom."[20] The policy provides coverage for "all sums which the insured shall become legally obligated to pay as damages because of bodily injury [i.e., bodily injury, *including* care and loss of services resulting therefrom] or property damage, to which this insurance applies, caused by an occurrence." The exclusion for expected or intended injury compels the exclusion from coverage of the bodily injuries themselves. See section 1, *supra.* The injuries to the adult tort plaintiffs in the form of "care and loss of services," however, remain within the scope of coverage, unless trial of the issues demonstrates that the insured intended to injure the adult tort plaintiffs.[21]

Nevertheless, Worcester argues that the phrase "resulting therefrom" "makes clear that care and loss of services are a subset of bodily injury, sickness or disease and that, therefore, coverage for a claim for loss of consortium cannot exist unless there is coverage for the bodily injury . . . from which it resulted." Worcester's argument appears to be that only "care [and] loss of services" resulting from a *covered* bodily injury are covered. Nothing in the policy language compels such a result. The policy provides coverage for bodily injury and for care and loss of services resulting therefrom, subject to the *later* limiting phrase — which triggers the exclusion — "to which this insurance applies." Only the initial bodily injury (assault and battery) is excluded by this limitation.

---

[20]This definition, which explicitly includes consortium-type injuries, renders irrelevant our assumption in *Bilodeau* v. *Lumbermens Mut. Casualty Co.*, 392 Mass. 537, 541 (1984), when we were interpreting different policy language, that "loss of consortium is not a 'bodily injury.' "

[21]Worcester invites us to find that the insured intended the injury to the parents. We do not find facts. See note 16, *supra.*

See *Interstate Fire & Casualty Co.* v. *Stuntman Inc.*, 861 F.2d 203 (9th Cir. 1988) (clause providing coverage for damages "because of personal injury" includes coverage for emotional injuries arising out of physical injuries not covered under the terms of an unrelated exclusion).

Worcester argues that "coverage for loss of consortium is derivative of coverage for the underlying bodily injury." This argument also fails. We have rejected the argument that consortium claims are essentially derivative on a number of previous occasions. See *Pinheiro* v. *Medical Malpractice Joint Underwriting Ass'n of Mass.*, 406 Mass. 288, 291 (1989); *Bilodeau* v. *Lumbermens Mut. Casualty Co.*, 392 Mass. 537, 539 (1984); *Feltch* v. *General Rental Co.*, 383 Mass. 603, 607 (1981). Although it is clear that a consortium claim bears a "symbiotic" relation to the initial claim of injury to a spouse or other family member, *Corrigan* v. *General Elec. Co.*, 406 Mass. 478, 480 (1990), it is an independent injury, explicitly included in the policy coverage through the policy's definition of bodily injury. Cf. *Pinheiro*, *supra* at 291.

Moreover, we would apply the exclusion to the consortium injuries only if such injuries were *unambiguously* excluded by the policy language. Worcester's argument convinces us merely that the policy may be ambiguous. "It is well established that, where an insurer drafts the policy . . . all ambiguities are resolved against the insurer." *Liberty Mut. Ins. Co.* v. *Tabor*, 407 Mass. 354, 362 (1990), quoting *Transamerica Ins. Co.* v. *Norfolk & Dedham Mut. Fire Ins. Co.*, 361 Mass. 144, 147 (1972). See *Quincy Mut. Fire Ins. Co.* v. *Abernathy*, 393 Mass. 81, 83 (1984). Thus, the homeowner's policy covers any consortium injury that is not itself subject to an exclusion.[22]

---

[22]Much like Worcester's policy, Merrimack's homeowner's policy defines bodily injury as "bodily harm, sickness or disease, including required care, loss of services and death resulting therefrom." Coverage is provided if a suit "is brought against any insured for damages because of bodily injury or property damage to which this coverage applies." This language is subject to the same analysis as the very similar language in Worcester's pol-

b. *SMP policies*. Worcester's SMP policies provide coverage for "all sums which the insured shall become legally obligated to pay as damages because of bodily injury . . . to which this insurance applies, caused by an occurrence." Bodily injury is defined as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom." Unlike the definition of bodily injury in the homeowner's policies, this definition of bodily injury does not appear to include consortium injuries. Consortium injuries are covered, however, as "damages *because of* bodily injury," as long as the bodily injuries are ones "to which this insurance applies, caused by an occurrence." This "occurrence" qualification excludes consortium injuries arising out of the assaults and batteries. See section 1, *supra*. It does not, however, exclude consortium injuries relating to bodily injuries suffered by the minor tort plaintiffs as a result of negligence or breach of warranty. See sections 4 and 5a, *supra*. Cf. *Hazen Paper Co.* v. *United States Fidelity & Guar. Co.*, 407 Mass. 869 (1990) (clause providing coverage for "damages because of . . . property damage" covers costs of reimbursing government agencies for toxic waste clean-up).

Worcester argues that we should not construe consortium claims as "damages because of bodily injury," because nothing in the policy indicates that there is coverage for suits brought by third parties (such as consortium claimants) for losses occasioned by a covered bodily injury. We note, however, that nothing in the policy language excludes such coverage. Indeed, the simplest and most direct interpretation of "damages because of bodily injury" includes any damages, including loss of consortium, arising from a bodily injury. Because any ambiguity is resolved against Worcester, see *Liberty Mut. Ins. Co.* v. *Tabor*, *supra*; *Quincy Mut. Fire Ins.*

icy. Thus, the Merrimack policy covers consortium injuries that are not themselves subject to a policy exclusion.

*Co.* v. *Abernathy, supra,* Worcester's argument on this point is without merit.[23]

7. *Multiple occurrences.* The eighth reported question asks us whether it can be determined as a matter of law "that the claims of the underlying tort plaintiffs arise from no more than one occurrence, thereby limiting each insurer's[24] liability, if any, to the applicable 'per occurrence' policy limit?" The SMP policies define "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury."[25] The term "occurrence" that appears in the policies was used by the insurance industry instead of the term "accident" beginning in the 1960's. The term "occurrence" was adopted "to dispel any existing notion that [coverage] was limited to sudden happenings." Rosow & Liederman, An Overview to the Interpretive Problems of "Occurrence" in Comprehensive General Liability Insurance, 16 Forum 1148, 1149 (1981).

The question, in essence, asks us to determine whether the facts alleged are susceptible to the interpretation, advanced by Worcester, that the "single, ongoing cause of the children's injuries was their continuous and repeated exposure to abusive conditions at the School." Relying on *Appalachian Ins. Co.* v. *Liberty Mut. Ins. Co.,* 676 F.2d 56 (3d Cir. 1982), and *Transport Ins. Co.* v. *Lee Way Motor Freight,* 487 F. Supp. 1325, 1330 (N.D. Tex. 1980), Worcester argues that the abuse of the children in this case must be interpreted as a single "occurrence." The cases relied on by Worcester hold that in circumstances where many corporate employees suffered from a discriminatory corporate employ-

---

[23]We also note that similar language in certain motor vehicle insurance policies has been interpreted as we interpret these SMP policies. See *Ferreira* v. *Travelers Ins. Co.,* 684 F. Supp. 1150, 1152-1153 (D.R.I. 1988), and cases cited. See also *Bilodeau, supra* at 541-542. Cf. *Interstate Fire & Casualty Co.* v. *Stuntman Inc., supra.*

[24]Only Worcester presents argument on this point.

[25]Worcester's homeowner's policy defines "occurrence" as "an accident, including injurious exposure to conditions, which results . . . in bodily injury." The differences between this definition and the definition in the SMP policies do not affect our conclusion on this point.

ment policy, there was but one "occurrence": the adoption of the discriminatory policy. We need not decide if we would follow those cases if faced with similar facts, because those cases are fundamentally different from the facts before us.

The tort plaintiffs allege numerous discrete acts of abuse, negligence, and breach of duty by several different defendants, some individual and one corporate, at different locations. These allegations preclude the possibility that there was but a "single, ongoing cause" of the injuries alleged. Further, we have rejected attempts by insurers to characterize seemingly discrete events as emanating from a single, ongoing cause. See, e.g., *Continental Casualty Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 151 (1984) (rejecting insurer's interpretation that a second episode of structural damage to a building was an extension of an earlier incident of breakage); *Slater* v. *United States Fidelity & Guar. Co.*, 379 Mass. 801, 809 (1980) (refusing to interpret employee scheme to execute numerous small thefts as a single occurrence). We do so here as well. The allegations in the stipulation, if proved, would constitute more than one occurrence.

The cases are remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

APPENDIX.

"I. Whether the claims against the defendants in the underlying tort cases are not covered by policies of liability insurance because, based upon the Stipulation and Statement of Agreed Facts, the injuries for which recovery is sought by the underlying tort plaintiffs were, as a matter of law, 'expected or intended' by the insureds?

"II. Whether the claims of assault and battery against Violet Amirault, Gerald Amirault, and Cheryl Amirault LeFave are not covered by the SMP policies issued by Worcester Insurance Company because, based upon the Stipulation and Statement of Agreed Facts, as a matter of law, the acts for which recovery is sought by the underlying tort plaintiffs were not performed within the scope of their duties as officers, directors or stockholders of Fells Acres Day School, Inc.?

"III. Whether, based upon the Stipulation and Statement of Agreed Facts, as a matter of law, the claims asserted against Violet Amirault d/b/a Fells Acres Day School are not covered under the SMP policies issued by Worcester Insurance Company?

"IV. Whether, based upon the Stipulation and Statement of Agreed Facts, as a matter of law, the claims asserted jointly against Fells Acres Day School, Inc., and/or Violet Amirault d/b/a Fells Acres Day School as alleged partners or joint venturers are neither actionable nor covered under the SMP policies issued by Worcester Insurance Company?

"V. Whether, based upon the Stipulation and Statement of Agreed Facts, the claims of vicarious liability for assault and battery against (1) Fells Acres Day School, Inc. and (2) Fells Acres Day School, Inc. and/or Violet Amirault d/b/a Fells Acres Day School are, as a matter of law, based upon intentional torts which were outside the scope of employment and not in furtherance of the employer's work?

"VI. Whether the alleged conduct of the individual defendants in the underlying tort cases, as a matter of law, supports only claims of intentional tort?

"VII. Whether each of the claims against Violet Amirault and Cheryl Amirault LeFave is not covered by their respective Homeowner's policies because, based upon the Stipulation and Statement of Agreed Facts, as a matter of law, one or more of the policies' business risk exclusions applies?

"VIII. Whether it can be determined, based upon the Stipulation and Statement of Agreed Facts, as a matter of law, that the claims of the underlying tort plaintiffs arise from no more than one occurrence, thereby limiting each insurer's liability, if any, to the applicable 'per occurrence' policy limit?"