NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

19-P-1407                                         Appeals Court


    COSMIN MARCULETIU  vs.  SAFETY INSURANCE COMPANY & others.[1]


                        No. 19-P-1407.

        Middlesex.     June 11, 2020. - October 2, 2020.

            Present:  Rubin, Milkey, & Massing, JJ.



Insurance, Coverage, Insurer's obligation to defend,
    Construction of policy.  Contract, Insurance.  Rape.  False
    Imprisonment.  Negligence.  Employment, Sexual Harassment.
    Practice, Civil, Dismissal, Declaratory proceeding.




    Civil action commenced in the Superior Court Department on
January 25, 2016.

    Motions to dismiss were heard by Rosemary Connolly, J., and
Salim Rodriguez Tabit, J.; motions for reconsideration were
considered by them; and the entry of judgment was ordered by
Bruce R. Henry, J.


    James E. Grumbach for the plaintiff.
    Sharon S. Angelino, of Connecticut, for National Casualty
Insurance Company.
    Tanya T. Austin for Safety Insurance Company.

_____

        [1] National Casualty Insurance Company, International Ballet
Academy of Norwell, Inc., doing business as New England Movement
Arts, and L.C.

MILKEY, J.  When their paths first crossed in 2013, Cosmin Marculetiu and L.C. were ballet dancers at markedly different points in their respective careers.  Marculetiu, then forty-four, had become a dance instructor of international renown.  L.C., then twenty-three, had just completed college and hoped to make a career out of being a professional dancer.  L.C. took some classes at a dance studio in Burlington operated by Marculetiu's company, International Ballet Academy of Norwell, Inc. (IBAN), and she appeared in performances of a ballet produced by IBAN.  Any professional relationship between L.C. and Marculetiu ended in 2014 after she accused him of raping her during a trip to Romania for an international ballet competition.  The following year, L.C. filed a multi-count civil action in Superior Court against Marculetiu and IBAN.  Marculetiu denied L.C.'s allegations and counterclaimed for defamation, intentional interference with advantageous relations, and abuse of process.  Both L.C.'s tort action (underlying case) and Marculetiu's counterclaims remain pending.

The appeal before us involves insurance coverage related to the underlying case.  In 2016, Marculetiu filed a declaratory judgment action against National Casualty Insurance Company (National), which was IBAN's comprehensive general liability (CGL) insurance carrier, and Safety Insurance Company (Safety), his own homeowner insurance carrier.  He alleged that both

insurers had a duty to defend the underlying action, as well as a duty to indemnify him should he be held liable for damages in that action.  Based principally on the fact that the underlying action involved allegations of rape and other intentional sexual assaults, each insurer filed a motion to dismiss claiming that, as a matter of law, it had no duty to defend or indemnify Marculetiu.  The motions were allowed by separate judges, and judgment entered for the defendants.  Marculetiu's motions for reconsideration also were denied, and Marculetiu appealed.  For the reasons that follow, we affirm, albeit on different grounds than relied upon by either judge.

Background.  1.  The claims set forth in the underlying action.  Because the complaint in the underlying action provides the touchstone of whether the insurers had a duty to defend Marculetiu, we begin by summarizing the allegations set forth there.

According to her complaint, L.C. first met Marculetiu in August of 2013 when she attended a dance class at IBAN's studio in Burlington.  The context of the meeting was that one of Marculetiu's students needed a new dance partner, and L.C. was trying out for that role.  L.C. alleges that Marculetiu was impressed with her dancing skills and that he wanted her to dance under his tutelage and to perform in various productions with which he was associated.  She began attending classes at

the Burlington studio, during which -- she alleges -- Marculetiu sometimes touched her in a manner that made her uncomfortable. Together with her new partner, L.C. danced in performances of the Nutcracker Suite that IBAN produced. She also agreed to serve as a substitute dance instructor at the Burlington studio, although her services in that capacity apparently were never utilized. L.C. alleges that Marculetiu used his position of authority to gain her "trust and confidence."

According to the complaint, Marculetiu convinced L.C. to compete in the "World Ballet Competition" to be held in Romania in March of 2014. Marculetiu, who is originally from Romania, co-founded the event and served as one of its judges. He told L.C. that he would introduce her to many important people at the event, and that her attending it would be a boost to her career by "land[ing] her dancing contracts all over the country and world."

L.C. alleges that on the plane flight over to the dance competition, she awoke to find Marculetiu groping her with his hands under her shirt and down her pants. According to her, once they were in Romania, Marculetiu entered her hotel room (to which he had his own key), professed his love for her, "then forcibly removed her clothes and pushed her onto the bed, where he sexually assaulted her." Over the next several days, she alleges, he "repeatedly raped and sexually assaulted her" in her

room.  The complaint alleges that she was in an especially vulnerable position given that she was traveling alone in a foreign country where she did not speak the native language.

According to L.C., after four days of sexual assaults, she told Marculetiu that she did not want to have sex with him and had pretended to be in love with him only because she was scared of what he might do to her, including potentially not letting her return to the United States.  She alleges that he initially was remorseful to hear this but then renewed his sexual assaults of her.  She claims that on one occasion he raped her after he must have put a drug in her drinks, because -- after consuming six drinks -- she "could barely walk by herself or see straight."  Marculetiu denies that he had any form of sexual contact with L.C. or that he ever made any sexual advances toward her.

L.C.'s complaint included ten counts brought against Marculetiu.[2]  Five of the counts allege various forms of sexual assault:  rape, assault and battery, indecent assault and battery, assault with intent to rape, and drugging for sexual intercourse.  The remaining counts are for intentional infliction of emotional distress, false imprisonment,

---

[2] All ten counts were also brought against IBAN.  In addition, L.C. brought two counts against IBAN only, one based on respondeat superior and another for negligent supervision and retention.

negligence, breach of fiduciary duty, and loss of consortium. Further details regarding these counts are reserved for later discussion.

As explained below, whether National owed Marculetiu any duties under IBAN's CGL policy was resolved first, based only on the allegations in L.C.'s complaint in the underlying action. When the second judge addressed Safety's duties under the homeowner's policy, he had before him some additional factual materials that had been elicited in discovery. Then, after both motions to dismiss had been allowed, Marculetiu filed a motion seeking reconsideration of both rulings, and attached to that motion were additional discovery materials, including deposition transcripts. In particular, the transcripts of the depositions of L.C., and of one of her therapists, provide illuminating detail about what she specifically was alleging occurred during the trip to Romania.[3]  For present purposes it suffices to note the following.  At least with respect to some of the sexual encounters that L.C. alleged, certain statements that she made -

---

[3] The deposition transcripts also included a deposition of Marculetiu, who flatly denied that anything untoward happened during the trip.  Marculetiu also provided a markedly different version of his professional relationship with L.C.  He characterized her as someone who occasionally took adult group classes that were open to all, not as a promising dance student whom he individually had taken under his wing.  With respect to his having hired L.C. for a lead role in the Nutcracker Suite, he portrays this as a last-minute substitute for another dancer who had to withdraw for medical reasons.

- either directly in her deposition or to her therapist -- could be taken by a fact finder as being in tension with her claims that any actions taken by Marculetiu rose to the level of forcible rape.  For example, L.C. stated that she, at various points, affirmatively took actions expressly designed to make Marculetiu believe that she welcomed a sexual relationship with him.[4]  At the same time, the deposition transcripts also suggest that if L.C. acquiesced to any sexual advances that Marculetiu might have made, she did so in the context of a mentor-mentee relationship in which there was a significant imbalance of power.

2.  <u>Relevant policy provisions</u>.  a.  <u>CGL policy</u>.  IBAN purchased a CGL policy from National.  The "coverage territory" under the policy is defined to include not only the United States, but "[a]ll other parts of the world if the injury or damage arises out of . . . activities of a person whose home is in [the United States], but is away for a short time on [the insured's] business . . . ."

IBAN itself is the principal insured under the CGL policy.[5] However, employees of IBAN are also insureds, "but only for acts

---

[4] L.C. alleges that she did so at least in part out of fear of reprisals from Marculetiu.

[5] In fact, National provided counsel for IBAN in the underlying action.

within the scope of their employment by [IBAN] or while performing duties related to the conduct of [IBAN's] business." Similarly, IBAN's "'executive officers' and directors are insureds, but only with respect to their duties as [IBAN's] officers or directors."

Three types of coverage under the CGL policy potentially apply. "Coverage A" applies to property damage and bodily injury claims caused by an occurrence. "Occurrence" is defined in the standard manner to "mean[] an accident." Various exclusions apply to Coverage A, including one for injuries "expected or intended from the standpoint of the insured."

"Coverage B" applies to "personal and advertising injury," which is defined to include claims for false imprisonment. Various exclusions apply. One is for "'personal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" Another exclusion is for "'personal and advertising injury' arising out of a criminal act committed by or at the direction of the insured."

By separate endorsement, IBAN also purchased "professional liability coverage for sports or fitness activities." This coverage applied to claims for bodily injury or property damage caused by a "wrongful act," which was defined to include "any

breach of duty, neglect, error, omission, misstatement, or misleading statement in the discharge of 'sports or fitness activities.'" Various exclusions apply, including one for "[a]ny claim or 'suit' arising out of either undue familiarity, sexual abuse or licentious, immoral or sexual behavior intended to lead to, or culminating in any sexual act, whether caused by, or at the instigation of, or at the direction of, either known or unknown by any insured or the customers or patrons of the [n]amed insured."

In addition to the individual exclusions that apply to each type of coverage, the CGL policy included a separate endorsement entitled "SEXUAL ABUSE EXCLUSION -- ILLINOIS." The body of the exclusion states that coverage "does not apply to any claim, 'suit' or cause of action, including defense of same, for any person who actively participates in any act of sexual misconduct, sexual molestation or physical or mental abuse of any person." It further states that "[t]his exclusion shall apply regardless of the legal form any claim may take by way of negligence, breach of contract or assault."

b. Homeowner's policy. Marculetiu and his wife purchased a homeowner's policy from Safety in connection with their home in Quincy. Under "Coverage E," that policy covered personal liability claims brought by third parties "for damages because of 'bodily injury' . . . . caused by an 'occurrence.'"

"Occurrence" again is defined in the standard way to mean "an accident."

Various exclusions generally apply to Coverage E. One is for bodily injury that is "expected or intended by the 'insured.'" Another -- known commonly as the "business pursuits exclusion" -- is for injury "[a]rising out of or in connection with a 'business' engaged in by an 'insured.'" A third is for injury "[a]rising out of sexual molestation, corporal punishment or physical or mental abuse."

By way of separate endorsement, the homeowner's policy also included "personal injury" coverage under Coverage E. "Personal injury" is expressly defined to include "injury arising out of . . . [f]alse arrest, detention or imprisonment." The separate endorsement providing such coverage states that "[e]xclusions do not apply to 'personal injury.'" It then goes on, however, to list six types of injury that are not covered. Among these is "[i]njury caused by a violation of a penal law or ordinance committed by or with the knowledge or consent of an 'insured.'" Another such provision uses language identical to the business pursuits exclusion generally applicable to Coverage E.

3. The Superior Court rulings. a. National's motion to dismiss. In moving to dismiss Marculetiu's action, National argued, inter alia, that coverage in any event was expressly excluded by the endorsement entitled "SEXUAL ABUSE EXCLUSION --

ILLINOIS."  In a ruling entered in January of 2017, a Superior Court judge (first judge) rejected that argument, because she agreed with Marculetiu that the endorsement was ambiguous with respect to whether it applied only in Illinois or more generally.

The first judge nevertheless ruled in National's favor on other grounds.  She concluded that all of the counts in the underlying action except for negligence and breach of fiduciary duty "alleged intentional conduct (for example, false imprisonment) or criminal conduct (for example rape, drugging someone for the purpose of having sex, assault and battery)" that were excluded by "clear policy language."  With respect to the counts alleging negligence and breach of fiduciary duty, she concluded that while these nominally were brought against both IBAN and Marculetiu, they "are directed to IBAN . . . and not to [Marculetiu] himself."  The judge did not address whether Marculetiu's alleged actions were sufficiently related to his various roles at IBAN as to entitle him to coverage under IBAN's CGL policy as an executive officer, director, or employee.

b.  Safety's motion to dismiss and Marculetiu's cross motion.  Safety eventually filed its own motion to dismiss. Marculetiu opposed that motion and cross-moved for partial summary judgment with respect to Safety's duty to defend. Appended to Marculetiu's motion were certain limited discovery

materials (not including the deposition transcripts referenced above).

In August of 2017, a different Superior Court judge (second judge) allowed Safety's motion to dismiss and denied Marculetiu's cross motion for partial summary judgment. He concluded that the underlying action alleged intentional sexual misconduct for which no coverage would lie either because any injury was not caused by an "occurrence" or because the injury was excluded as "expected or intended" by Marculetiu. To the extent the underlying action sought to bring a count against Marculetiu based on negligence, the judge concluded that such a "count is more properly construed as an intentional tort." Similarly, the judge concluded that the count based on an alleged breach of a fiduciary duty also was excluded because "it was Marculetiu's alleged intentional conduct that breached the duty."

With respect to the false imprisonment count, the judge characterized the claim as "inseparable from the sexual assault allegations," stating that it "relates directly to the allegation that Marculetiu held [L.C.] down while assaulting her." The judge separately ruled that "even assuming [the false imprisonment count is] separate from the intentional torts and [is] potentially covered under the personal liability section of the policy, [it] would be specifically excluded as 'injuri[ies]

caused by a violation of a penal law or ordinance committed by or with the knowledge or consent of an "insured."'" The second judge did not reach the question whether the business pursuits exclusion applied.

c. Motion for reconsideration. Marculetiu filed a motion for reconsideration of the allowance of National's and Safety's motions to dismiss. As noted, Marculetiu appended to that motion various deposition transcripts and other additional factual material. The two motion judges denied their respective portions of the motion. This appeal followed.

Discussion. 1. Legal framework and standard of review. As noted, Marculetiu alleges that each insurer owed him both a duty to defend and a duty to indemnify. We focus principally on the duty to defend, because "[i]t is axiomatic that an insurance company's duty to defend is broader than its duty to indemnify." Boston Symphony Orch., Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 10 (1989).

Although the insured bears the burden of demonstrating that his insurer's duty to defend has been triggered, that burden is satisfied by a showing of a mere "possibility" of coverage. Billings v. Commerce Ins. Co., 458 Mass. 194, 201 (2010). The question is whether the underlying allegations brought against the insured "are reasonably susceptible of an interpretation that states or roughly sketches a claim covered by the policy

terms."  Id. at 200.  As Justice Kaplan put it almost four decades ago, "the process is one of envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy."  Sterilite Corp. v. Continental Cas. Co., 17 Mass. App. Ct. 316, 318 (1983).

"The duty to defend is determined based on the facts alleged in the [underlying] complaint, and on facts known or readily knowable by the insurer that may aid in its interpretation of the allegations in the complaint."  Billings, 458 Mass. at 200, citing Boston Symphony Orch., Inc., 406 Mass. at 10-11.  An insured's denial of the underlying allegations has no bearing on whether a duty to defend exists, because coverage turns on the nature of those allegations, not on whether they are true.

As to both insurance policies here, the question we face is whether each motion judge correctly determined that the respective insurer had no duty to defend Marculetiu as a matter of law.  Our review of that question is de novo.  See Pacific Indem. Co. v. Lampro, 86 Mass. App. Ct. 60, 63 (2014); Norfolk & Dedham Mut. Fire Ins. Co. v. Cleary Consultants, Inc., 81 Mass. App. Ct. 40, 47 (2011) (Cleary).  Strictly speaking, the two halves of the case come to us in slightly different procedural

postures, because the second judge had before him certain factual material that the first judge did not, and the legal issues raised were considered in part in the context of summary judgment. In the end, those slight differences are not material, and no party argues otherwise on appeal. As noted, Marculetiu also brought additional factual material to the judges' attention when he moved for reconsideration. Putting aside whether the judges were required even to consider that additional material, that material does not ultimately affect the outcome of this case.

The dispute before us is relatively narrow. Marculetiu makes no claim that either insurer has a duty to defend or indemnify him with respect to L.C.'s core allegations that he raped her or otherwise committed intentional sexual assaults against her. Instead, he argues that the insurers' duties are triggered by three other claims that L.C. brought: breach of fiduciary duty, false imprisonment, and negligence.[6] We examine each insurer's duties regarding these counts in turn. With respect to each policy, we first review the grounds on which the judge relied in ruling in the insurer's favor, and then turn to

---

[6] As a general rule, if an insurer has a duty to defend part of an action, it must defend the entire action. See GMAC Mtge., LLC v. First Am. Title Ins. Co., 464 Mass. 733, 738-739 (2013), and cases cited.

the potential alternative grounds for affirmance that each insurer has argued.

2. CGL policy. L.C.'s complaint names both Marculetiu and IBAN as defendants with respect to her breach of fiduciary duty claim (count IX). Nevertheless, the first judge ruled that this count did not trigger National's duty to defend Marculetiu, because she concluded that it effectively was directed only at IBAN, not Marculetiu. We disagree. For the reasons that follow, we conclude that the breach of fiduciary duty count "roughly sketches" a claim against Marculetiu even without applying the liberality that the cases mandate that judges employ in assessing whether an insurer's duty to defend has been triggered.

In count IX, L.C. alleges that Marculetiu (and IBAN) owed her, as "a ballet student," a fiduciary duty that they breached. She further alleges that Marculetiu (and IBAN) "were in a far superior position of knowledge, authority, control and power over [her], and given the circumstances she was placed in, [she] was unable to protect herself alone against harm and abuses of trust." Although not formally labeled as such, count IX sounds in terms of a claim for sexual harassment against both Marculetiu and IBAN. See G. L. c. 151B, § 1 (18) (providing statutory definition of "sexual harassment"). See generally Bagley v. Monticello Ins. Co., 430 Mass. 454, 458 (1999) ("It is

the source from which the plaintiff's personal injury originates rather than the specific theories of liability alleged in the complaint which determines the insurer's duty to defend" [emphasis and citation omitted]).  Because the count alleging breach of fiduciary duty is not directed only against IBAN, the sole ground upon which the first judge relied in concluding that it did not raise a possibility of coverage is untenable.

We also disagree with the first judge's reasoning that L.C.'s count alleging false imprisonment raised no possibility of coverage.  The judge explained that this count did not trigger coverage because it was an "intentional" act that in some unidentified way was expressly excluded.  Not only did IBAN purchase personal liability coverage that expressly included coverage for "false imprisonment," an intentional tort, but also under the terms of such coverage the exclusion for "expected or intended" conduct does not even apply.[7]

Although we disagree with the specific grounds on which the judge relied, we can affirm the judgment on any grounds fairly addressed by the record.  See Gabbidon v. King, 414 Mass. 685,

---

[7] Unlike count IX, alleging breach of fiduciary duty, count VIII -- which alleges negligence nominally against both IBAN and Marculetiu -- is directed almost entirely against IBAN. Moreover, the complaint otherwise alleges that Marculetiu's actions were intentional.  Given our resolution of this appeal, we need not resolve whether L.C.'s allegations could -- on the margins -- make out a case of negligence against Marculetiu.

686 (1993). We therefore turn to the additional arguments that National raises.

National's lead argument for why there is no possibility of coverage is that any injuries that L.C. suffered from Marculetiu's alleged conduct could not be considered "accidental" as a matter of law.[8] The key question in resolving that issue is <u>not</u> whether Marculetiu intended the alleged actions that caused such injuries, but instead whether he specifically intended to cause the injuries themselves. See <u>Quincy Mut. Fire Ins. Co</u>. v. <u>Abernathy</u>, 393 Mass. 81, 84 (1984) ("injury which ensues from the volitional act of an insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur").[9] Accord <u>Dorchester Mut. Ins. Co</u>. v. <u>Krusell</u>, 485 Mass.

---

[8] This argument goes to Marculetiu's efforts to seek coverage under Coverage A, which requires the injury at issue to have been caused by an "occurrence." As noted, IBAN purchased separate professional liability coverage, but that coverage is subject to an express exclusion for "undue familiarity, sexual abuse or licentious, immoral or sexual behavior intended to lead to, or culminating in any sexual act." Unsurprisingly, Marculetiu is not claiming that National owes him duties under the professional liability coverage.

[9] In <u>Quincy Mutual</u>, the court reversed the allowance of summary judgment in favor of an insurer with respect to allegations that the insured intentionally had thrown a "large piece of [asphalt]" at a car that injured the car's occupants. 393 Mass. at 82. The court concluded that a specific intent to injure could not be inferred as a matter of law from the

431, 436 n.11 (2020). Thus, the commission of an intentional tort does not necessarily preclude the resulting injuries from being considered "accidental" for purposes of assessing insurance coverage.

Notably, L.C. can make out a claim of sexual harassment without alleging that Marculetiu's actions amounted to rape or other forms of intentional sexual assault. She need claim only that Marculetiu abused his position of power as her employer or teacher by making unwanted sexual advances toward her.[10] See, e.g., Morrison v. Northern Essex Community College, 56 Mass. App. Ct. 784, 785, 789-792 (2002) (student athletes asserted sexual harassment claims under Title IX of Education Amendments of 1972, 20 U.S.C. § 1681, and G. L. c. 151C, § 2 [g], by alleging their coach made sexual comments towards them, touched

---

intentional act of throwing the asphalt. Id. at 87-88. See Preferred Mut. Ins. Co. v. Gamache, 42 Mass. App. Ct. 194, 200-201, S.C., 426 Mass. 93 (1997) (where underlying claim was that insured had injured police officer's knee by forcibly grabbing his belt, insured's intent to injure officer could not be determined as matter of law).

[10] In the current appeal, no party has focused on whether Marculetiu in fact qualified as L.C.'s employer or teacher for purposes of maintaining a sexual harassment claim. See Lowery v. Klemm, 446 Mass. 572, 580 & n.10 (2006). There is certainly enough in L.C.'s complaint to "roughly sketch" that Marculetiu served in such a capacity. Moreover, whether such a relationship existed goes to whether Marculetiu has defenses that he could raise to a sexual harassment claim, not whether the insurers had a duty to defend him regarding such a claim. The same would apply to other potential defenses to a sexual harassment claim.

them in inappropriate ways, and engaged in other sexually harassing activities). She need not prove that Marculetiu's actions amounted to rape or other forms of intentional sexual assault. While it may well be that someone found liable for sexual harassment specifically intended to injure the person being harassed, we do not believe that a specific intent to injure must be inferred as a matter of law. Indeed, as we previously have noted in a case involving insurance coverage, the statutes governing sexual harassment claims "provide that sexual harassment may occur in the absence of an intent to injure." Timpson v. Transamerica Ins. Co., 41 Mass. App. Ct. 344, 351 & n.4 (1996). See Maine State Academy of Hair Design, Inc. v. Commercial Union Ins. Co., 1997 ME 188, ¶¶ 8-9 (bodily injury incurred by victim of sexual harassment "was at least potentially unanticipated," thus precluding decision that injury was not accidental as matter of law). With regard to the specific allegations that L.C. has raised, it is possible to imagine a jury concluding that Marculetiu committed actionable sexual harassment without possessing a specific intent to cause her injury.[11] Contrast Liberty Mut. Fire Ins. Co. v. Casey, 91

---

[11] Perhaps the strongest support for a jury to conclude that Marculetiu may not have intended to harm L.C. when he allegedly made sexual advances toward her is found in the deposition transcripts. These were not before either judge when they initially ruled on the motions to dismiss. However, even in her

Mass. App. Ct. 243, 247, 252 (2017) (because it was "undisputed that [insured] punched [victim] multiple times and kicked him once in the face," insured's intent to injure victim established as matter of law).

In claiming that an intent to injure L.C. must be inferred as a matter of law even with respect to her breach of fiduciary duty claim, National relies on two opinions from the Supreme Judicial Court. See Doe v. Liberty Mut. Ins. Co., 423 Mass. 366, 369-371 (1996) (Doe); Worcester Ins. Co. v. Fells Acres Day Sch., Inc. (Fells Acres), 408 Mass. 393, 398-403 (1990). In Fells Acres, the insurers maintained that they had no duty to defend or indemnify the insureds, who had been convicted of molesting and raping children at a day care center. 408 Mass. at 397-398. Specifically, the insurers argued that the injuries suffered by the children were not "accident[al]" and therefore did not result from an "occurrence[]." See id. at 399. For essentially the same reason, the insurers also argued that the injuries were "expected or intended from the standpoint of the insured" and were therefore excluded from coverage in any event. Id. at 398 & n.6. The court agreed, concluding that "an intent to injure may be inferred as a matter of law from acts of child molestation and rape." Id. at 401.

---

complaint itself, L.C. alleged that she had "pretend[ed] to be in love with" Marculetiu.

In Doe, the underlying allegations were that a junior high school principal used his position to gain the trust of a student whose breasts and genital area he then fondled. 423 Mass. at 367-368. Applying Fells Acres, the court concluded that, as a matter of law, the insured's alleged actions are presumed to have been carried out with an intent to injure the student. Id. at 369-370. Accordingly, the court held that the insurer had no duty to defend or indemnify the insured, and that recasting the principal's alleged actions as constituting negligence could not provide coverage because "[i]t is not possible for intentional sexual misconduct also to be negligent." Id. at 370, citing Fells Acres, 408 Mass. at 410.

National urges upon us a broad interpretation of Fells Acres and Doe under which all forms of "intentional sexual misconduct" are excluded from coverage, and under which the three claims on which Marculetiu now relies effectively are subsumed within the excluded claims. We are unpersuaded by National's arguments regarding the breadth of those cases. Although the court held that the alleged injuries in each case could not have been "accidental," critical to the court's reasoning was the fact that each case involved the intentional sexual abuse of children. We do not interpret those cases, as National would have it, as establishing a sweeping rule that an insured who engaged in some form of volitional "sexual

misconduct" with another adult necessarily must have intended to injure that person.[12]

In sum, we are unpersuaded by National's argument that the nature of L.C.'s breach of fiduciary duty claim precluded coverage as a matter of law. For the same reason, National cannot show that the harm from such a claim necessarily was excluded as "expected or intended" by Marculetiu.

National next argues that the first judge erred in concluding that the CGL policy was ambiguous about whether the exclusion entitled "SEXUAL ABUSE EXCLUSION -- ILLINOIS" applied outside of Illinois. According to National, the inclusion of the reference to Illinois "merely reflects that the Illinois version of the endorsement was included in the Policy."[13] Assuming the provision can be read to that effect, this is not

---

[12] Injuries that L.C. suffered from Marculetiu's alleged sexual advances would not be deemed "expected or intended" by him even if he had acted with reckless disregard. See Fells Acres, 408 Mass. at 411 ("Generally, injuries resulting from reckless conduct do not fall into the category of 'expected or intended' injuries, but are considered 'accidental' and thus are covered under insurance policies").

[13] National suggests that the reference to Illinois is an artifact of how IBAN obtained its coverage. Specifically, National points out that IBAN obtained coverage through a master policy purchased by an association of sports organizations to which IBAN belonged, and that this association is based in Illinois. This history may well explain why the word Illinois came to appear in the heading, but it says next to nothing about whether the resulting language is ambiguous.

the only reasonable reading of it.[14]  We agree with the first judge that the provision is ambiguous about whether the exclusion applies outside of Illinois, and that -- in accordance with black letter insurance law -- the ambiguity must be read in favor of the insured.  Dorchester Mut. Ins. Co., 485 Mass. at 437, citing Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London, 449 Mass. 621, 628 (2007).  Cf. Assicurazioni Generali, S.P.A. v. Clover, 195 F.3d 161, 165 (3d Cir. 1999) (in choice of law case involving Pennsylvania vehicle accident, court held "the parties at least implicitly and perhaps even explicitly" selected Indiana law to govern where policy's endorsement was titled "Indiana Changes").

We turn next to whether Marculetiu could claim coverage under the CGL policy as an "insured," an issue that applies to all of L.C.'s claims.  Despite the threshold nature of this

---

[14] To be sure, as National points out, the language of the body of the exclusion does not state that it is limited to Illinois, but instead refers to "any" claim based on sexual misconduct being excluded.  However, the use of the word "any" is not textually incompatible with Marculetiu's narrower reading:  the exclusion readily can be read as precluding coverage for "any" sexual misconduct claim arising in Illinois. Cf. Merrimack College v. KPMG LLP, 88 Mass. App. Ct. 803, 806 (2016) (in case where defendant argued for expansive reading of phrase "any other services provided," to encompass services provided before provision went into effect, "[t]he fact that [the defendant's] preferred reading [wa]s linguistically possible d[id] not make it a reasonable interpretation of the parties' agreement").

issue, National focused on other issues, and the first judge did not address it.[15]

As noted, it was IBAN, not Marculetiu, that purchased the CGL policy, and under the policy's terms, Marculetiu was entitled to coverage as an insured only to a limited extent. As an employee of IBAN, his coverage extends only to those actions that are "within the scope of [his] employment by [IBAN] or [taken] while performing duties related to the conduct of [IBAN's] business." The question is whether his alleged conduct during the trip to Romania could be said to fall within that category.[16]

_____

[15] National initially did not press the issue whether Marculetiu was an insured party. We requested supplemental briefing from the parties on whether Marculetiu was an insured party under National's CGL policy, as well as on the separate issue whether the business pursuits exclusion in Safety's homeowner policy applied. Citing to cases in which an appellant's failure to brief an issue was deemed a waiver, Marculetiu argues that National has waived the issue. However, we can affirm a judgment on any grounds fairly raised by the record, and an appellee has no duty even to file an appellate brief. Mass. R. A. P. 19 (e), as appearing in 481 Mass. 1642 (2019). Where the insurance coverage disputes before us can be resolved as a matter of law, and where both sides now have briefed the two issues, we exercise our discretion to reach them.

[16] IBAN's "volunteer workers" are also insured parties under the CGL policy to the extent they are "performing duties related to the conduct of [IBAN's] business." Marculetiu asserts that while he was in Romania, he effectively served as "IBAN's volunteer, 'goodwill ambassador.'" Since both paid employees and volunteer workers are insured parties with respect to their "performing duties related to the conduct of [IBAN's] business,"

We faced an analogous situation in <u>Timpson</u>, 41 Mass. App. Ct. at 344-345. The question raised there was whether the insurer of the New England Patriots football team owed a member of the team a duty to defend him against allegations that he sexually harassed a female reporter in the locker room. Under the applicable policy there, the player was an "additional insured" only with respect to actions "within the scope of his duties." <u>Id</u>. at 348. In examining whether the alleged harassment fell within that scope, we applied a three-part test drawn from <u>Wang Labs., Inc</u>. v. <u>Business Incentives, Inc</u>., 398 Mass. 854 (1986) (<u>Wang</u>).[17] "Under <u>Wang</u>, the factors that determine whether an employee's tortious conduct was within the scope of his employment include whether (1) the conduct is of

---

we will not address separately the distinction between regular employees and volunteers.

[17] <u>Wang</u> was not a case involving insurance coverage, but instead dealt with whether a corporation could be vicariously liable under G. L. c. 93A for the actions of its employee. See <u>Wang</u>, 398 Mass. at 859. See also <u>Petrell</u> v. <u>Shaw</u>, 453 Mass. 377, 383-384 (2009) (diocese could not be vicariously liable for sexual misconduct by priest because alleged conduct not within scope of his employment). As discussed further below, insurance coverage issues are controlled by the language of the applicable insurance contract, which may not necessarily be consistent with principles of vicarious liability. <u>Metropolitan Prop. & Cas. Ins. Co</u>. v. <u>Fitchburg Mut. Ins. Co</u>., 58 Mass. App. Ct. 818, 820 (2003). However, where the acts in question plainly do not fall within the scope of employment -- as that concept has developed in the context of vicarious liability questions -- the employee will need to identify additional policy language that affords him coverage as an insured party.

the kind he is employed to perform; (2) it occurs substantially within authorized time and space limits; and (3) it is motivated, at least in part, by a purpose to serve the employer." Timpson, supra, citing Wang, supra at 859. We further stated that where "an employee 'acts from purely personal motives . . . in no way connected with the employer's interests,' he is not acting within the scope of his employment." Timpson, supra, quoting Pinshaw v. Metropolitan Dist. Comm'n, 402 Mass. 687, 694-695 (1988). Applying these factors, we held that even though the alleged harassment of the reporter took place at the player's place of employment during work hours, and even though the player's contract required him to "cooperate with the media," the player's alleged actions could not fairly be characterized as falling within the scope of his duties. Id. at 349-350. We emphasized that the specific actions that the player allegedly took were not of the sort he was required to perform, nor did they constitute "the kind of conduct that he ever would be legally employed to perform." Id. at 349. In addition, we concluded that "it is difficult to envisage how [his] alleged conduct . . . could ever be perceived as serving his employer." Id. Cf. O'Connell v. Chasdi, 400 Mass. 686, 690 (1987) (claims for assault and battery and intentional infliction of emotion distress based on sexual harassment not barred by exclusivity provision of worker's

compensation act, because intentional torts at issue were "in no way within the scope of employment furthering the interests of the employer").

The considerations we recognized in Timpson apply even more forcefully here. Putting aside the extent to which IBAN itself had any involvement in the trip to Romania, the actions that L.C. alleges Marculetiu took there cannot fairly be characterized as serving any of IBAN's interests. Rather, those alleged actions self-evidently served only Marculetiu's interests. Accordingly, these actions cannot reasonably be said to fall within Marculetiu's scope of employment, and he therefore cannot claim status as an insured party on that basis. However, Marculetiu argues that the CGL policy includes language that creates a broader universe of covered employees than the policy at issue in Timpson. Specifically, Marculetiu points to the fact that under the policy here, an IBAN employee can be an insured party not only with respect to actions taken within the scope of his employment, but also for actions taken "while performing duties related to the conduct of [IBAN's] business." Even if such language arguably applies to some employee conduct that lies beyond the scope of that employee's employment, we are unpersuaded that it was intended to include the alleged behavior at issue here. Simply put, Marculetiu's engaging in any of the alleged misconduct at issue here cannot reasonably be said to

have been done while "performing duties related to" IBAN's business.  Therefore, we conclude that National had no duty to defend Marculetiu in his capacity as IBAN's employee (or "volunteer worker").[18]

To the extent that Marculetiu claims that National had a separate duty to defend him in his role as an officer or director of IBAN, we similarly are unpersuaded.  Under the express terms of the CGL policy, as an officer and director, he is entitled to a defense only with respect to his duties as an officer and director.  IBAN's alleged negligent hiring and supervision of Marculetiu is the only theoretical respect with which his serving as an officer or director is implicated by L.C.'s allegations.  An employee who commits an intentional tort cannot be liable for negligently hiring or failing to supervise himself.  See, e.g., DiSalvio v. Lower Merion High Sch. Dist., 158 F. Supp. 2d 553, 560-561 (E.D. Pa. 2001) ("employee wrongdoer . . . cannot be liable for negligent hiring, retention or supervision of himself").[19]

---

[18] Our holding is not inconsistent with Cleary, 81 Mass. App. Ct. at 48 (rejecting insurer's claim it had no duty to defend sexual harassment claim).  The issue in Cleary was whether the company's insurer had a duty to defend it and its president, not the person accused of the sexual harassment.  Id. at 41.

[19] Our conclusion that National had no duty to defend Marculetiu in the underlying litigation should not be taken as bearing on whether National had a duty to defend IBAN in that

3. Homeowner's policy. We disagree with the second judge's reasoning with regard to why Safety had no duty to defend Marculetiu under his homeowner's policy. For the reasons discussed above, L.C.'s claim for breach of fiduciary duty is not excluded from coverage simply because it is based on volitional conduct. In addition, as noted, the judge ruled Safety had no duty to defend L.C.'s false imprisonment claim primarily because of the judge's premise that the false imprisonment claim was based solely on Marculetiu's allegedly holding down L.C. during the sexual assaults.[20] That premise does not square with L.C.'s complaint, which sketches a more

---

action or on IBAN's potential liability to L.C. In addition, we note that employers face potential liability for sexual harassment by their employees even where the actions at issue may be outside the scope of their employment. See, e.g., College-Town, Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination, 400 Mass. 156, 167 (1987) (employer liable for supervisor's sexual harassment of supervisee employee).

[20] The judge also found the false imprisonment claim as necessarily falling outside the scope of coverage on the ground that it was barred by the exclusion for "violation[s] of . . . penal law." He did not explain what criminal laws would have been broken. We note that Marculetiu has not faced any criminal charges related to L.C.'s allegations. See Metropolitan Prop. & Cas. Ins. Co. v. Morrison, 460 Mass. 352, 353 (2011) ("a guilty plea does not negate an insurer's duty to defend, even where the duty to defend would be negated by a criminal conviction after trial, because a guilty plea is not given preclusive effect and is simply evidence that the insured's acts were intentional and criminal").

broadly based claim.[21]  Nevertheless, for the reasons that follow, we again hold that the insurer is entitled to a judgment in its favor based on a ground the judge did not reach.

As noted, the coverage that Marculetiu seeks is subject to a business pursuits exclusion under which Safety bears no liability for "[i]njury arising out of or in connection with a 'business' engaged in by the 'insured.'"  As we observed in a case construing the scope of the business practices exclusion, "[t]he terms 'arising out of' and 'in connection with' are not to be construed narrowly but are read expansively in insurance contracts."  Metropolitan Prop. & Cas. Ins. Co. v. Fitchburg Mut. Ins. Co., 58 Mass. App. Ct. 818, 820-821 (2003).  Accord Nguyen v. Arbella Ins. Group, 91 Mass. App. Ct. 565, 568-569 (2017).  Moreover, it bears remembering that "the manifest design of homeowners' insurance is to protect homeowners from risks associated with the home and activities related to the home."  Metropolitan Prop. & Cas. Ins. Co., supra at 823, quoting Worcester Mut. Ins. Co. v. Marnell, 398 Mass. 240, 245 (1986).

---

[21] At oral argument, Safety's counsel notably did not seek to defend the second judge's premise that the factual allegations underlying L.C.'s false imprisonment claim were confined to the rapes themselves.  Instead, she argued that the actions that Marculetiu allegedly took to confine L.C. constituted one of the means through which he allegedly induced her to submit to his sexual advances.

It is uncontested that any injuries suffered by L.C. from Marculetiu's alleged acts occurred out of the country on a work-related trip.  Under these circumstances, we agree with Safety that regardless of whether Marculetiu's alleged actions were motivated by personal or business reasons, any resulting injuries arose out of or in connection with Marculetiu's business pursuits, and thus are excluded.  See Metropolitan Prop. & Cas. Ins. Co., 58 Mass. App. Ct. at 820.  See also Fells Acres, 408 Mass. at 412.  Contrast Dorchester Mut. Ins. Co., 485 Mass. at 446 (objectively reasonable insured would not interpret exclusion in homeowner's policy for "physical abuse" as precluding coverage for pushing third party he had just met).  With regard to any sexual harassment claims, our conclusion is reinforced by the fact that any liability that Marculetiu faces depends on his having been L.C.'s employer or teacher.  Lowery v. Klemm, 446 Mass. 572, 580 & n.10 (2006).  See Zimmerman v. Safeco Ins. Co. of Am., 605 N.W.2d 727, 731 (Minn. 2000) ("sexual harassment of an employee falls within the general business pursuits exclusion of the [homeowner's] policy because by definition it occurs in the workplace").  See also Greenman v. Michigan Mut. Ins. Co., 173 Mich. App. 88, 94 (1988) (sexual harassment claim falls within business pursuits exclusion where

it "could not, by definition, exist outside of the employer-employee relationship").[22]

Conclusion.  Because we conclude that neither insurer had a duty to defend Marculetiu with respect to the underlying action, we affirm the judgment.[23]  We similarly affirm the orders denying Marculetiu's motions for reconsideration.

---

[22] Our holding is consistent with Preferred Mut. Ins. Co. v. Vermont Mut. Ins. Co., 87 Mass. App. Ct. 510 (2015) (Preferred).  There, a party was injured after the homeowners' son had failed to secure the railing on the home's second floor deck.  The son both lived at the home (which made him an additional insured under his parents' homeowner's policy) and had his own commercial insurance for his contracting business.  Id. at 511.  We ruled that the homeowners' insurer had failed to prove that the business pursuit exclusion negated the insurer's duty to defend the son.  In reaching this conclusion, we concluded that "determining when an activity arises out of or in connection with the insured's business" should be done in accordance with "a two-prong functional test."  Id. at 514.  "The first element of the test is 'continuity' -- that is, the activity in question must be one in which the insured regularly engages as a means of livelihood; the second element is 'profit motive' -- that is, the purpose of the activity must be to obtain monetary gain."  Id.  However, in applying that two-pronged test to the case before us, the question is not whether the alleged acts of sexual misconduct met that test, but whether such acts arose out of business activities that met the test.  See Nguyen, 91 Mass. App. Ct. at 569-570 (distinguishing Preferred).  Because Marculetiu's alleged actions occurred in the context of a work-related relationship on a work-related trip far from home, this is not a close question.  Contrast Wilkinson v. Citation Ins. Co., 447 Mass. 663, 668-669 (2006) (insurance coverage did lie under homeowner's policy with respect to damage to property related to insured's hobby caused by fire at insured's home).

[23] The judgment did not declare the rights of the parties, as Marculetiu's complaint had requested, but instead simply dismissed his complaint.  Marculetiu has not challenged the form of the judgment as constituting separate error, and we therefore

                          So <u>ordered</u>.

_____

need not address the issue.  See <u>Buffalo-Water 1, LLC</u> v. <u>Fidelity Real Estate Co.</u>, 481 Mass. 13, 18-20 (2018).