NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 140

No. 2015-073

| | |
|---|---|
| Neil and Patricia Whitney | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, |
| | Civil Division |
| | |
| Vermont Mutual Insurance Company | September Term, 2015 |

Cortland Corsones, J.

Karl C. Anderson of Anderson & Eaton, P.C., Rutland, for Plaintiffs-Appellees.

Andrew C. Boxer of Ellis Boxer & Blake PLLC, Springfield, for Defendant-Appellant.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **ROBINSON, J.** This case calls upon us to apply a "pollution exclusion" in an insurance policy for the second time in a year. Plaintiffs Neil and Patricia Whitney assert that damage to their home and personal property resulting from the spraying within their home of a pesticide known as chlorpyrifos is covered by their homeowners policy. Defendant Vermont Mutual Insurance Company (Vermont Mutual) argues that the pollution exclusion in the policy bars the Whitneys' claim. The Rutland Superior Court, Civil Division, granted the Whitneys' summary judgment motion on the question of coverage, concluding that the exclusion in question was ambiguous, and construing the ambiguous provision in favor of coverage. We conclude that the property damage to the Whitneys' home is an excluded risk in the applicable policy and accordingly reverse.

¶ 2.    The facts in this case are undisputed. The Whitneys live in Rutland, and their home is insured by a policy issued by Vermont Mutual. The Whitneys are foster parents, and at some point in April 2013, they noticed bed bugs in their home after a new foster child was placed with them by the Vermont Department for Children and Families (DCF). Shortly thereafter, at the behest of DCF, Triple A Pest Control (Triple A) sprayed the Whitneys' home with the pesticide chlorpyrifos in order to eradicate the bed bugs. Triple A sprayed the house, corner to corner, wall to wall, and sprayed the Whitneys' personal effects within the home, including the inside of the oven and the ductwork of the forced hot air heating system. When the Whitneys returned to their home after the spraying operation, the walls and surfaces of the home were visibly dripping with the pesticide.

¶ 3.    Chlorpyrifos is a toxin that can cause "nausea, dizziness, confusion, and, in very high exposures, respiratory paralysis and death." The substance is banned for residential use by the Federal Environmental Protection Agency, and the spraying of the Whitneys' home with chlorpyrifos violated federal and state law.

¶ 4.    Concerned by the amount of chemicals sprayed within their home, the Whitneys contacted DCF, who referred them to the Vermont Department of Agriculture (the Department). When the Whitneys informed the Department's representative of the name of the applicator, the representative advised them to stay out of the house until it could be tested. Following testing about a week after the spraying, a representative of the Department advised the Whitneys to stay out of their home until further notice.

¶ 5.    The testing revealed high levels of chlorpyrifos. According to the EPA, a cleanup is required if testing reveals levels in excess of 0.006 micrograms per square centimeter. Swabs of the Whitneys' home revealed concentration levels of chlorpyrifos as high as 3.99 micrograms per square centimeter. As a result of the extremely high concentration levels, the Whitneys have been unable to inhabit their home since April 29, 2013.

¶ 6.    Shortly after the Department's testing, the Whitneys filed a claim with Vermont Mutual.  Coverage A of their homeowners policy insures against a "physical loss to property."  Among the exclusions to the property damage coverage in Coverage A is a "pollution exclusion."  In particular, the policy states that insurer does not insure for loss caused by:

> discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C of this policy.  Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

¶ 7.    Vermont Mutual denied the Whitneys' claim, citing the pollution exclusion.  The Whitneys filed suit against Vermont Mutual in April 2014, seeking a declaratory judgment that the losses incurred by the spraying of chlorpyrifos within their home were covered by their homeowners policy, as well as a determination of their damages.  On cross-motions for summary judgment on the question of coverage, the trial court ruled in the Whitneys' favor.  The court reasoned that the terms "pollution" and "discharge, dispersal, release, and escape" are ambiguous in the context of this case, and that these terms should therefore be construed in favor of coverage.   In reaching this conclusion, the trial court relied on MacKinnon v. Truck Insurance Exchange, 73 P.3d 1205 (Cal. 2003), which held that pollution-exclusion clauses are generally ambiguous and therefore apply only to traditional environmental disasters.  Id. at 1216-17.

¶ 8.    The trial court granted Vermont Mutual's motion for interlocutory appeal.  During the interim, we issued our decision in Cincinnati Specialty Underwriters Insurance Co. v. Energy Wise Homes, Inc., 2015 VT 52, ¶¶ 2, 27-28, ___ Vt. ___, 120 A.3d 1160 (enforcing unambiguous pollution-exclusion clause in a commercial general liability policy).

¶ 9.    On appeal, Vermont Mutual argues that the trial court erred in finding the pollution exclusion ambiguous.  In addition, Vermont Mutual argues that even if the pollution exclusion is ambiguous and we construe it to apply only to traditional environmental

3

contamination, the intentional spraying of chlorpyrifos throughout the Whitneys' home qualifies as the kind of traditional environmental pollution that falls squarely within the scope of the policy's pollution exclusion.

¶ 10. We review a trial court's decision to grant summary judgment de novo, and apply the same standard as the trial court. Down Under Masonry, Inc. v. Peerless Ins. Co., 2008 VT 46, ¶ 5, 183 Vt. 619, 950 A.2d 1213 (mem.). "Summary judgment is appropriate if the material facts are undisputed and any party is entitled to judgment as a matter of law." Progressive Cas. Ins. Co. v. MMG Ins. Co., 2014 VT 70, ¶ 10, 197 Vt. 253, 103 A.3d 899; see V.R.C.P. 56(a).

¶ 11. The parties do not dispute the material facts giving rise to the Whitneys' loss. Rather, the issue is whether the pollution-exclusion clause in the property damage coverage in Vermont Mutual's homeowners policy excludes the damage to the Whitneys' home resulting from the spraying of chlorpyrifos throughout their home. The interpretation of an insurance policy is a question of law that we review de novo. See State v. Prison Health Servs., Inc., 2013 VT 119, ¶ 9, 195 Vt. 360, 88 A.3d 414 (noting that whether duty to defend exists pursuant to contract is "a question of law, which we review de novo"); see also Dep't of Corr. v. Matrix Health Sys., P.C., 2008 VT 32, ¶¶ 11-12, 183 Vt. 348, 950 A.2d 1201 (explaining that our review of trial court's interpretation of parties' contract is nondeferential).

¶ 12. In this case, we are asked to determine whether the pollution exclusion in the property damage coverage in the Whitneys' homeowners policy excludes coverage for the loss of their home due to the spraying of chlorpyrifos inside the home. As noted above, we considered a similar issue recently in Cincinnati, 2015 VT 52. In that case, a company that specialized in insulating buildings and homes sought coverage under its commercial general liability policy for a claim by an individual who asserted that she was injured as a result of airborne chemicals and airborne residues from the spray-foam insulation installed by the company. The applicable policy language in the liability policy excluded coverage for "[b]odily

4

injury . . . [that] would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." Id. ¶ 4 (quotation omitted). The policy defined "pollutants" as:

> any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. "Pollutants" include but are not limited to, that which has been recognized in industry or government to be harmful or toxic to persons, property or the environment, regardless of whether the injury, damage, or contamination is caused directly or indirectly by the "pollutants" and regardless of whether: (a) The insured is regularly or otherwise engaged in activities which taint or degrade the environment; or (b) The insured uses, generates or produces the "pollutant."

Id. ¶ 5 (quotation omitted).

¶ 13. In Cincinnati, we reviewed the evolution of pollution-exclusion clauses in the insurance industry and discussed the leading cases construing those clauses—an exercise we will not repeat here. See id. ¶¶ 17-24. In particular, we considered two divergent lines of cases construing these clauses. In one, following the analysis of the California Supreme Court in the case of Mackinnon v. Truck Insurance Exchange, courts have construed pollution exclusions very narrowly, concluding that they are inherently ambiguous, and that the purpose of the exclusions was to address liability arising from traditional environmental pollution, and not "ordinary acts of negligence involving harmful substances." 73 P.3d at 1216. In the other, courts have concluded that by their plain language such clauses exclude all injuries that occur from pollutants. See, e.g., Quadrant Corp. v. Am. States Ins. Co., 110 P.3d 733 (Wash. 2005).

¶ 14. We concluded that we did not have to address whether the standard "absolute pollution exclusion" would have excluded the risk of bodily injury from the spray foam insulation that caused harm to the plaintiff because the language in the policy in Cincinnati was even broader than the standard "absolute pollution exclusion." 2015 VT 52, ¶ 27. Considering

5

the specific language of the policy, we concluded that injury from inhaling chemicals that became airborne as a result of the company's application of spray-foam insulation qualified as injury resulting from a "dispersal" or "release" of the chemicals under a common-sense reading. Id. ¶ 26. We also concluded that the residues at issue had been "recognized in industry or government to be harmful or toxic to persons, property, or the environment," and thus fit within the policy's definition of "pollutants." Id. (quotation omitted). Although we recognized that application of the exclusion left the insured company exposed in connection with an obvious risk for a company that applies spray-foam insulation, we concluded that the plain language of the policy governed, and that the loss in question was clearly excluded from the policy. Id. ¶ 27.

¶ 15. The main lesson of Cincinnati for our purposes is that pollution exclusions are not presumed, as a class, to be ambiguous or to be limited in their application to traditional environmental pollution. They should be construed in the same way as any other insurance contract provision.* Our goal in interpreting an insurance policy, like our goal in interpreting any contract, is to ascertain and carry out the parties' intentions. Sperling v. Allstate Indem. Co., 2007 VT 126, ¶ 8, 182 Vt. 521, 944 A.2d 210. Therefore, we interpret policy language according to its "plain, ordinary and popular meaning." Id. (quotation omitted).

¶ 16. Words or phrases in an insurance policy are ambiguous if they are fairly susceptible to more than one reasonable interpretation. Id. If we determine that language within the policy is ambiguous, we construe the ambiguity against the insurer. Serecky v. Nat'l Grange

---

* The policy in question in Cincinnati was a surplus-lines commercial general liability policy. It did not comply with the Department of Financial Regulation's requirements for policies approved in Vermont because the Department requires all insurers issuing liability policies in Vermont to provide coverage for pollution by endorsement. See Cincinnati, 2015 VT 32, ¶ 2 n.1. The exclusion at issue here appears in connection with the property damage coverage of a homeowners policy. No state regulation requires a pollution endorsement or prohibits a pollution exclusion in such policies. But, these contextual differences between the pollution-exclusion provisions in Cincinnati and this case do not undermine the applicability of this central lesson of Cincinnati with respect to the interpretation of pollution-exclusion provisions.

Mut. Ins., 2004 VT 63, ¶ 17, 177 Vt. 58, 857 A.2d 775 (noting that if term is subject to more than one interpretation, "the ambiguity must be resolved in favor of the insured"). However, policies that "specifically and unambiguously exclude coverage are effective to preclude the insurer's liability," and "we cannot deny the insurer the benefit of unambiguous provisions inserted into the policy for its benefit." Sperling, 2007 VT 126, ¶ 14 (quotation omitted). Finally, we have held that the expectations of an insured cannot control over the unambiguous language of the policy. Vt. Mut. Ins. Co. v. Parsons Hill P'ship, 2010 VT 44, ¶ 28, 188 Vt. 80, 1 A.3d 1016. "No court may rewrite unambiguous contractual terms to grant one party a better bargain than the one it made." Downtown Barre Dev. v. C & S Wholesale Grocers, Inc., 2004 VT 47, ¶ 14, 177 Vt. 70, 857 A.2d 263 (quotation and alteration omitted).

¶ 17. The pollution exclusion in this case excludes from coverage any loss caused by "discharge, dispersal, seepage, immigration, release, or escape of pollutants." "Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." That the dousing of the Whitneys' home with chlorpyrifos constitutes "discharge, dispersal, seepage, immigration, release, or escape" of the substance is clear. See Cincinnati, 2015 VT 52, ¶ 26 (application of spray-foam insulation "represents a 'dispersal' or 'release' of such chemicals under a common-sense reading of those terms"). Whether chlorpyrifos, applied in this context, qualifies as a "pollutant" is the more contested question in this appeal.

¶ 18. In Cincinnati, the policy definition of "pollutant" was very similar to the definition here. See id. ¶ 5 (noting that policy defined "pollutant" as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste"). However, in that case, the policy elaborated on the definition in ways that the policy in this case does not. Id. (noting that policy definition explained that "pollutants" included "that which has been recognized in

7

industry or government to be harmful or toxic to persons, property or the environment"). For that reason, our determination in Cincinnati that the spray-foam insulation qualified as a pollutant under the terms of that policy is not dispositive here. In this case, the question is whether the chlorpyrifos is a "contaminant" or "irritant."

¶ 19. The undisputed facts are that chlorpyrifos is: toxic to humans; can cause nausea, dizziness, confusion, and at very high exposures, respiratory paralysis and death; and is banned for residential use. Triple A's use of chlorpyrifos in the Whitneys' home violated EPA regulations, and federal and state law. The concentration levels of the substance in the Whitneys' home were consistently high relative to the EPA "action level" at which the EPA has determined that cleaning of housing units is required. As a result of the contamination, the Whitneys have been unable to live in their home. We do not find it hard to conclude that, in the context of this case, the terms "irritant," "contaminant," and "pollutant" plainly and unambiguously encompass the chlorpyrifos sprayed "corner to corner, wall to wall" throughout the Whitneys' home. As we have previously noted, "we cannot deny the insurer the benefit of unambiguous provisions inserted into the policy for its benefit." Sperling, 2007 VT 126, ¶ 14.

¶ 20. Our conclusion is bolstered by decisions of other courts, which have found similar pesticides to be pollutants. See Haman, Inc. v. St. Paul Fire & Marine Ins. Co., 18 F. Supp. 2d 1306, 1308-09 (N.D. Ala. 1998) ("Despite [methyl parathion's] legitimate uses, reasonable persons would agree that a highly regulated chemical . . . is a pollutant, irritant, or contaminant."); Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co., 711 So.2d 1135, 1141 (Fla. 1998) (finding ammonia to be "extremely hazardous substance" and therefore pollutant for purposes of pollution exclusion clause); Great Lakes Chem. Corp. v. Int'l Surplus Lines Ins. Co., 638 N.E.2d 847, 851 (Ind. Ct. App. 1994) (indicating that ethylene dibromide, a soil fumigant pesticide, was "pollutant" within literal meaning of the term, because EPA banned

8

its use, but deciding underlying claims against insured pesticide manufacturer were in essence product-liability claims and therefore fell outside of pollution exclusion for this reason).

¶ 21.    For the above reasons, we reverse the trial court's award of summary judgment to the Whitneys, and direct the trial court to award summary judgment to Vermont Mutual.

Reversed.

FOR THE COURT:

_____

Associate Justice

9