Filed 05/14/25

| | | |
|---|---|---|
| VERMONT SUPERIOR COURT |  | CIVIL DIVISION |
| Chittenden Unit | | Case No. 24-CV-03700 |
| 175 Main Street | | |
| Burlington VT 05401 | | |
| 802-863-3467 | | |
| www.vermontjudiciary.org | | |

---

The Hanover Insurance Company v. The Media Factory f/k/a Vermont Community Access Media, Inc.
et al

---

## DECISION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

In February 2024, in the matter of *Ciara Kilburn, et al. v. Bill Simmon, et al.*, 20-CV-461, a jury returned a plaintiffs' verdict against Defendant The Media Factory f/k/a Vermont Community Access Media, Inc. ("VCAM") and one of its employees. VCAM's liability insurer, Plaintiff Hanover Insurance Company ("Hanover"), then brought this action against VCAM and the plaintiffs in the underlying suit, seeking a declaration as to the scope of its coverage obligations with respect to that verdict. VCAM counterclaimed, seeking declaratory relief and damages. Hanover and VCAM have since cross-moved for summary judgment.[1] The court denies Hanover's motion and grants VCAM's in part.

## BACKGROUND

The parties' papers establish the following facts as undisputed for the purpose of these motions. In the underlying action, Ciara Kilburn and Brona Kilburn alleged that in 2012 Bill Simmon, then an employee of VCAM, used a hidden camera to record them changing in and out of costumes in a utility room and then posted those videos on the internet. Ciara and Brona became aware of those videos in 2018 and subsequently sued Simmon and VCAM. The jury found that Simmon invaded Ciara and Brona's privacy and that VCAM negligently supervised Simmon. It awarded Ciara and Brona $1.75 million each from Simmon in compensatory damages, another $1.75 million each from VCAM in compensatory damages, and another $2 million each from Simmon in punitive damages. VCAM and the Kilburns filed cross-appeals; the appeal is currently pending. *See Kilburn v. Simmon*, 24-AP-210.

---

[1] Technically, these are cross-motions for partial summary judgment. Hanover seeks judgment on the single count of its Complaint and, implicitly, the mirror-image claim asserted in Count I of VCAM's Counterclaim, leaving Counts II–V of the Counterclaim unaddressed; VCAM's cross-motion is similarly limited in its scope. But to quote Juliet, "[w]hat's in a name?" WILLIAM SHAKESPEARE, ROMEO AND JULIET, act 2, sc. 2.

Hanover issued Commercial Line Policy No. ZHV 8849689 07 ("the Policy") to VCAM for the period from October 5, 2017 through October 5, 2018. That Policy included the Commercial General Liability ("CGL") coverage at issue here. The CGL Coverage Form describes the two coverages at issue here: Coverage A insures against "Bodily Injury and Property Damage Liability," while Coverage B insures against "Personal and Advertising Injury Liability." Policy, Pl.'s Ex. B, pp. 49–55 (filed Dec. 2, 2024).[2] The CGL declarations include the following language:

> Limits of Insurance:
> | | |
> |---|---|
> | General Aggregate Limit | $2,000,000 |
> | * * * | |
> | Each Occurrence Limit | $1,000,000 |
> | Personal and Advertising Injury Limit | Excluded |

*Id.*, p. 9 (filed Dec. 2, 2024). The CGL Coverage Form defines "Occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.*, p. 63.

In September 2019, VCAM received a letter of representation from counsel for the Kilburns, advising it of the claims that underlie this dispute. In October 2020, VCAM was served with the Summons and Complaint in the underlying case. Upon receipt of each of these submissions, VCAM promptly forwarded it to Hanover. Hanover issued no reservation of rights with respect to its obligations under the Policy. Instead, it engaged counsel to represent VCAM and subsequently controlled that defense. At no time prior to receipt of the verdict did Hanover advise VCAM of its current contention that the policy affords only $1,000,000 of coverage for what it contends was a single "occurrence." [3]

## DISCUSSION

Hanover seeks a declaration that there can be no recovery under "Coverage B," that there was only a single "occurrence" under Coverage A, and that VCAM's coverage under the Policy is therefore

---

[2] The Policy consists of multiple forms, with separate sequences of numbered pages on each form; it has been filed as a single PDF document. For simplicity, the court's page references follow the pagination of the PDF document, rather than the pagination of the individual forms.

[3] The court notes that in response to VCAM's assertion of its version of the facts set forth in the paragraph above, Hanover repeated the following boilerplate assertion: "The statement is irrelevant to the matter before the Court and should be disregarded and struck from the record. Even if considered, the assertion is disputed as it is based on facts that are not supported by the record and lack sufficient evidentiary foundation." No part of that assertion was correct. As shown below, these facts are clearly material. And the bald assertion that they are not supported by the record flies in the face of Hanover's own admissions. Most of these facts are supported not only by Hanover's response to the Kilburns' Statement of Undisputed Facts, but by its Answer to VCAM's Counterclaim. The rest are amply supported by sworn declaration made on personal knowledge. *See Johnson v. Harwood*, 2008 VT 4, ¶ 10, 183 Vt. 157 ("Rule 56's purposes are served equally well by sworn statements other than affidavits, provided that those statements meet the rule's other requirements."). At the very least, Hanover's reflexive denials test the limits of the obligation of candor to the tribunal.

limited to the $1 million per-occurrence limit. VCAM seeks a declaration that is the mirror image of Hanover's request: that "Coverage B" applies, and that there were two "occurrences."[4] It bears noting at the outset that implicit in each of these requests is the assumption that Hanover owes a duty to indemnify under "Coverage A." It is also implicit—indeed, Hanover acknowledges in its Complaint—that Hanover owes at least $1,000,000 under Coverage A. Finally, there is no dispute that the most Hanover can owe under the Policy, whether under Coverage A, Coverage B, or any combination of the two, is the Policy's aggregate limit of $2,000,000. Indeed, the Limits of Insurance section of the CGL Coverage Form makes clear that "[t]he General Aggregate Limit is the most we will pay for the sum of . . . [d]amages under Coverage A . . . and . . . [d]amages under Coverage B." Policy, Pl.' Ex. B, p. 58. Thus, the question for resolution on these cross-motions is whether Hanover's duty to indemnify VCAM is limited to the single occurrence limit of $1,000,000 or the aggregate limit of $2,000,000. A decision either that there were multiple occurrences or that Coverage B applies will leave the full aggregate limit exposed.

In their cross-motions, Hanover and VCAM offer divergent interpretations of the Policy's provisions that purport to exclude Coverage B, as well as those that deal with the definition and number of occurrences. The court need not wade into these waters, however, as Hanover plainly waived any argument that its exposure under Coverage A is limited to a single occurrence. As noted above, it is undisputed that Hanover assumed the defense of VCAM in the underlying suit without ever issuing a reservation of rights, much less securing the bilateral non-waiver agreement required by Vermont law. *See American Fidelity Co. v. Kerr*, 138 Vt. 359, 363 (1980) ("A unilateral reservation of rights . . .  is ineffective."). "Where a liability insurance company, with knowledge of the facts, and no effective reservation of its rights under its policy, takes charge of and defends an action against the insured, it is held to be estopped to deny its liability upon the ground that the risk was not covered." *Beatty v. Employers' Liab. Assur. Corp.*, 106 Vt. 25, 33 (1933); *see also*, *generally*, *Prof'l Consultants Ins. Co. v. Emps. Reinsurance Co.*, No. 1:03-CV-216, 2006 WL 751244, at *14 (D. Vt. Mar. 8, 2006); *City of Burlington v. Hartford Steam Boiler Inspection & Ins. Co.*, 190 F. Supp. 2d 663, 682, 685 (D. Vt. 2002), *aff'd sub nom. City of Burlington v. Indem. Ins. Co. of N. Am.*, 346 F.3d 70 (2d Cir. 2003); *Vermont Ins. Mgmt., Inc. v. Lumbermens' Mut. Cas. Co.*, 171 Vt. 601, 603 (2000) (mem.) ("We have long recognized that a bilateral reservation of rights agreement prevents a waiver of the right to dispute coverage.").

---

[4] In the alternative, VCAM asks for time for additional discovery pursuant to V.R.C.P. 56(d). Because the facts on which it seeks discovery are relevant to neither Hanover's motion nor VCAM's cross-motion—rather, they go to the separate question of whether Hanover engaged in bad faith, such as would expose it to liability for the full amount of the verdict against VCAM, regardless of limits—the court denies that request.

Hanover contends that the waiver/estoppel doctrine established in *Beatty* and its progeny is distinguishable because those cases "only address whether an insurer may argue that 'the risk was covered' . . . after defending without a reservation of rights." Hanover's Reply to Kilburns' Opp'n at 2. It contends that the issue here is "not whether Hanover preserved the ability to disclaim coverage," but that this action instead "seeks to confirm the limits of insurance that apply to the" jury verdict in the underlying lawsuit. *Id*. at 3. This argument relies on a narrow and sophistical reading of *Beatty* and its progeny, and so is not persuasive.

The concern highlighted in *Beatty* and related cases before and since arises out of the conflict that inheres whenever an insurer, with knowledge of defenses to its coverage obligations, undertakes the defense of an insured. *See, e.g., City of Burlington v. Hartford Steam Boiler Inspection*, 190 F. Supp. 2d at 682 ("Particularly, in the context of duty to defend policies, where insureds often lack the authority to control their defense, courts regularly find that an insurer must reply seasonably to an insured's notice of claim letter so that the insured does not lose an opportunity to conduct her own investigation, settle the claim, file her own lawsuit, or otherwise protect her interests."); *Mancini v. Thomas*, 113 Vt. 322, 330 (1943) ("The principle that controls here is the same as where an insurance company without objection takes over the conduct of a trial and after verdict attempts to contend that the policy in question does not cover the risk. In such cases the controlling factors are the inconsistent positions taken by the company and prejudice of the defendant's rights by its conduct."). The conflict is no less pernicious, nor the potential prejudice to the insured any less significant, when, as here, the defense is not to the existence of coverage but to the scope of the coverage obligation. Looking to the facts of this case, knowledge that the insurer may take the position that it owes only $1 million of coverage, when the policy provides a $2 million aggregate, is precisely the kind of information an insured would want to know before yielding control of the defense to the insurer. Equally, and relatedly, when a complaint alleges more than one event as a basis for liability, knowledge that the insurer believes that all such events add up to no more than one "occurrence," and so dramatically increase the insured's uninsured exposure, is critical information that ought to be shared. *Cf. Phillips v. Aetna Life Ins. Co.*, 473 F. Supp. 984, 989 (D.Vt. 1979) (Under Vermont law "the parties to an insurance contract owe each other mutual duties of good faith and stand in the position of fiduciaries in relation to each other."). The insured might then engage personal counsel to persuade defense counsel and the insurer to minimize the insured's uninsured exposure. It might also press for a verdict form that would not allow the insurer subsequently to argue, as Hanover does here, that

> [W]hile the jury was presented with this array of "discrete acts and omissions" of negligence offered by the Kilburns, the jury ultimately reached only one

Decision on Cross-Motions for Summary Judgment
Page **4** of **9**
24-CV-03700 The Hanover Insurance Company v. The Media Factory f/k/a Vermont Community Access Media, Inc. et al

conclusion: a finding of negligent supervision on the part of VCAM. This conclusion is directly reflected in the jury's verdict. That is, while the Kilburns sought to highlight multiple discrete acts of negligence, the jury, by rendering a verdict that only recognized one occurrence of negligent supervision, did not accept each individual claim or act presented. It focused its attention on the broader issue of supervision, and this finding stands as the sole conclusion regarding VCAM's negligence. This can be interpreted as the jury's intent to address the matter of negligence in a more general, overarching manner, rather than parsing each alleged discrete act individually. For the reasons above, there is one occurrence under the policy.

Hanover's Reply to Kilburns' Opp'n at 6 (filed Feb. 14, 2025). Of course, Hanover controlled the defense, and so effectively precluded VCAM from exerting any influence over the jury verdict form.

"Consistent with the implied duty of good faith, a duty to disclose certain information to the opposing party to a contract may arise 'from the relations of the parties, such as that of trust or confidence, or superior knowledge or means of knowledge.' " *City of Burlington v. Hartford Steam Boiler Inspection*, 190 F. Supp. 2d at 682 (quoting *White v. Pepin*, 151 Vt. 413, 416 (1989)). The court need not determine whether it was bad faith for Hanover to exercise that authority in a way that supported its as-yet undisclosed position on coverage; that determination may await further proceedings. It is sufficient for present purposes to observe that at the very least, Hanover is now estopped from making the argument it should have reserved long ago.

Hanover also cites *Sperling v. Allstate Indem. Co.*, 2007 VT 126, ¶ 25, 182 Vt. 521 for the unremarkable proposition that "an insured cannot use the waiver or estoppel doctrines to broaden coverage under the policy." *Id*. (citing *Laurendeau v. Metro. Life Ins. Co.,* 116 Vt. 183, 189 (1950); 7 L. Russ et al., Couch on Insurance § 101:8 (3d ed. 2005)) (quotation omitted). The policy in *Sperling*, however, clearly did not cover the insureds' claim for loss of personal property, so accepting the insureds' waiver argument there would have impermissibly "broaded[ed] coverage under the policy." *See id*. ("Thus, in the *absence of coverage for a named peril*, waiver alone cannot enable insureds to prevail.") (emphasis added). Here, in contrast, there is apparently no dispute that the Policy provides coverage under "Coverage A." Instead, the dispute is over how many "occurrences" there were for the purpose of determining the monetary limits of insurance coverage available. By not reserving that defense from the start, Hanover has waived it.

Even absent a determination of waiver, the same result would obtain as a matter of policy interpretation: Hanover's aggregate limit, rather than the single occurrence limit, applies. The interpretive principles that drive this conclusion are familiar. As with any other contract, "[a]n insurance policy is construed according to its terms and the evident intent of the parties as expressed in

the policy language." *Huntington Ingalls Indus., Inc. v. Ace Am. Ins. Co.*, 2022 VT 45, ¶ 19, 217 Vt. 195 (quotation omitted). "Policy provisions must be read together and viewed as an integrated whole." *Id.* (quotation omitted). With respect to ambiguities, our Supreme Court has explained:

> We interpret terms in an insurance policy according to their plain, ordinary, and popular meaning, and will enforce unambiguous terms as written. Words or phrases in an insurance policy are ambiguous if they are fairly susceptible to more than one reasonable interpretation. When the language is ambiguous, we construe the terms liberally in favor of the insured and full coverage. However, the fact that a dispute has arisen as to proper interpretation does not automatically render the language ambiguous.

*Id.* (citations and quotations omitted). "[P]olicies that specifically and unambiguously exclude coverage are effective to preclude the insurer's liability," and courts "cannot deny the insurer the benefit of unambiguous provisions inserted into the policy for its benefit." *Whitney v. Vermont Mut. Ins. Co.*, 2015 VT 140, ¶ 16, 201 Vt. 29 (quotation omitted). Moreover, "the expectations of an insured cannot control over the unambiguous language of the policy." *Id.* "The insured has the burden of proving coverage under the policy, and once coverage is shown, the insurer has the burden of proving any exceptions to coverage apply." *Huntington Ingalls*, 2022 VT 45, ¶ 19 (citing *N. Sec. Ins. Co. v. Stanhope*, 2010 VT 92, ¶ 10, 188 Vt. 520).

Here, "Coverage A" of the Policy provides that "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. . . . This insurance applies to 'bodily injury' . . . only if: [] The 'bodily injury' . . . is caused by an 'occurrence.' " Ex. B, p. 49. " 'Bodily injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." *Id.*, p.61. The Policy defines "Occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.*, p.63.

In determining the number of "occurrences" under a liability insurance policy, some courts follow the "cause theory," which looks to what caused the occurrence(s), while other courts follow the "effect" theory, which looks to the effect or result of the occurrence(s). While our Supreme Court has not addressed this split, the "cause theory" is the majority position. *See generally* 64 A.L.R.4th 668; Allocation of Losses in Complex Insurance Coverage Claims § 7:2. Even within the "cause theory," however, there are further nuances—particularly in negligent supervision cases. Some courts analyze the number of "occurrences" based on the conduct of the insured party (here, VCAM), while other courts look to the tortfeasor who commits multiple discrete acts that immediately precede the alleged injury (here, Simmon).

Thus, under the line of authority that Hanover urges this court to follow, a negligent failure to prevent multiple acts by a third-party would constitute a single occurrence. *See*, *e.g.*, *RLI Ins. Co. v. Simon's Rock Early Coll.*, 765 N.E.2d 247, 254 (Mass. App. Ct. 2002) (college's negligent failure to prevent shooting spree by student constituted one single occurrence under insurance policy); *Travelers Indem. Co. v. Olive's Sporting Goods, Inc.*, 764 S.W.2d 596, 599 (Ark. 1989) (holding that, although several people were injured in single shooting spree from allegedly negligent sale of firearms by insured sporting goods store, there was only one "occurrence" within the meaning of the policy). In contrast, under the line of authority favored by Defendants, "It is the act that causes the damage, which is neither expected nor intended from the standpoint of the insured, that constitutes the 'occurrence.' The insured's alleged negligence is not the 'occurrence'; the insured's alleged negligence is the basis upon which the insured is being sued by the injured party." *Koikos v. Travelers Ins. Co.*, 849 So. 2d 263, 271 (Fla. 2003); *see also*, *e.g.*, *Roman Cath. Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 991 N.E.2d 666, 672–73 (N.Y. 2013) ("incidents of sexual abuse within the underlying action constituted multiple occurrences"); *Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 765 A.2d 891, 903 (Conn. 2001) (looking to "immediate event that caused the claimants' injuries," thus resulting in multiple "occurrences").

This court concludes that the latter approach—taken by our sister Second Circuit states, New York and Connecticut—is the better one. "Focusing on the immediate cause—that is[,] the act that causes the damage—rather than the underlying tort—that is[,] the insured's negligence—is [] consistent with the interpretation of other forms of insurance policies." *Koikos*, 849 So. 2d at 271 (citing *Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co.*, 263 U.S. 487, 492 (1924) ("[T]he common understanding is that in construing [marine insurance] policies we are not to take broad views but generally are to stop our inquiries with the cause nearest to the loss. This is a settled rule of construction, and if it is understood, does not deserve much criticism, since theoretically at least the parties can shape their contract as they like.")); *see also*, *e.g.*, *Co-Operative Ins. Companies v. Woodward*, No. 168-8-10 Oecv, 2011 WL 8472970 (Vt. Super. Ct. Apr. 2011) (Eaton, J.) ("An 'occurrence' takes place at the time the party is actually damaged, rather than at some other moment when an allegedly wrongful act sets in motion the chain of events that eventually leads to the injury.") (citing *Farmers Alliance Mut. Ins. Co. v. Salazar,* 77 F.3d 1291, 1295–97 (10th Cir. 1996)).[5]

---

[5] The court notes also that notwithstanding Hanover's reliance on the decision of the intermediate court of appeals in *RLI Ins. Co. v. Simon's Rock Early Coll.*, 765 N.E.2d 247 (Mass. App. Ct. 2002), the Massachusetts precedent that is more closely on point with this case is *Worcester Ins. Co. v. Fells Acres Day Sch., Inc.*, 408 Mass. 393, 558 N.E.2d 958 (1990), which the *Simons Rock* court labored mightily (and in vain, in this court's view) to distinguish. There, on facts more closely analogous than the *Simons Rock* facts to this case, the Massachusetts Supreme Judicial Court rejected the "single

The court notes that the Policy defines "occurrence" merely as "an accident . . . ," and does not further define the term "accident." "Accident" here could reasonably refer to either VCAM's negligent supervision or the tortious acts taken by Mr. Simmon. Thus, to the extent it is ambiguous, the court gives it the meaning favorable to the insured. Furthermore, most of the cases cited by Hanover are mass shooting sprees, where the shootings took place within a matter of minutes, and therefore an ill fit here. Simmon's conduct, in recording the images and then distributing them months later, is much more analogous to the church sex abuse scenario. *See*, *e.g.*, *Roman Cath. Diocese of Brooklyn*, 991 N.E.2d 666; *Lee v. Interstate Fire & Cas. Co.*, 86 F.3d 101, 104 (7th Cir. 1996) ("a single negligent act undoubtedly can produce multiple 'occurrences' if the injuries are independent."). Hanover also relies on *Washoe Cnty. v. Transcon. Ins. Co.*, 878 P.2d 306 (Nev. 1994), where the Nevada Supreme Court held that the molestation of different children by a daycare center employee constituted only one occurrence when premised on the county's underlying negligence in licensing, investigating, and monitoring a daycare center. The insurance policy in *Washoe County*, however, included a pertinent provision not present here: "We note that this interpretation is consistent with another provision of the policy which provides that 'all damages arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.' " *Id*. at 310. Moreover, that decision has been criticized. *See H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 150 F.3d 526, 534 (5th Cir. 1998) ("We find, however, that the Nevada court's approach conflicts with the greater weight of authority and attempt[s] to avoid the inescapable fact that the sexual molestation caused the injuries.") (quotation omitted).

Hanover further contends that there was but one occurrence here because the Kilburns' injuries resulted from a "continuous or repeated exposure to substantially the same general harmful conditions." That part of the definition of "occurrence," however, was plainly intended to address environmental contaminants like asbestos and does not apply here. *See Roman Cath. Diocese of Brooklyn*, 991 N.E.2d at 674 ("In our view, sexual abuse does not fit neatly into the policies' definition of 'continuous or repeated exposure' to 'conditions.' This sounds like language designed to deal with asbestos fibers in the air, or lead-based paint on the walls, rather than with priests and choirboys. A priest is not a 'condition' but a sentient being.") (quotations and citations omitted). In any event, the Kilburns were not "expos[ed]" to VCAM's negligent supervision of Mr. Simmon; rather, they were exposed to Mr. Simmon's discrete acts of, first, surreptitiously taking photos and videos of them changing and then, much later, sharing those images online. The jury verdict form further reflects that

---

occurrence" conclusion. *Fells Acres*, 408 Mass. at 416–17. The court finds Hanover's attempt to distinguish the *Fells Acres* case no more persuasive than the Massachusetts Appeals Court's.

there were two "occurrences": The jury found that Mr. Simmon invaded the Kilburns' privacy by "taking the photos/videos" and also by "posting the photos/videos online/sharing them with a stranger." The court thus rejects Hanover's self-serving interpretation of the verdict form quoted above, and instead concludes that there were two "occurrences" under the Policy.

This conclusion, whether by waiver or as a matter of policy interpretation, effectively moots the question of whether Coverage B also applies here. Coverage A clearly does apply and equally clearly is not limited to a single $1,000,000 per occurrence limit. Rather, the only limitation to Hanover's coverage for the jury verdict against VCAM is the $2,000,000 aggregate limit. There can be no argument that any coverage available under Coverage B would operate to increase Hanover's exposure. Thus, the court declines to determine whether Coverage B was excluded from the Policy.

## ORDER

The court denies Hanover's motion and grants VCAM's motion in part. The court hereby declares that Hanover owes VCAM a duty of indemnification under Coverage A of the CGL coverage part of the Policy, up to its aggregate CGL coverage limit of $2,000,000, against the verdict obtained by the Kilburns in the underlying suit. The determination that VCAM owes this duty under Coverage A moots any consideration of obligations owed under Coverage B. VCAM and the Kilburns are entitled to judgment as a matter of law on Hanover's Complaint. VCAM is also entitled to judgment as a matter of law on Count I of its Counterclaim. Counts II-V remain for further proceedings.

Electronically signed pursuant to V.R.E.F. 9(d): 5/14/2025 1:22 PM

_____
Samuel Hoar, Jr.
Superior Court Judge